VERA KIRKPATRICK v. WABASH RAILROAD COMPANY, Appellant.—No. 40726.—212 S. W. (2d) 764.

Division One, July 12, 1948.

*Jayne & Jayne* for appellant.

1248

*Philip J. Fowler* and *W. E. Shirley* for respondent.

1250

[765] CONKLING, J.—Respondent-plaintiff recovered a judgment for $8,000 against appellant-defendant, Wabash Railroad Company, for the death of her husband which resulted on the afternoon of July 20, 1946, when the truck he was driving east was struck by defendant's northbound freight train on the Hamilton Street crossing in Kirksville, Missouri. From that judgment defendant has appealed.

At the outset we are confronted with plaintiff's motion to dismiss the appeal. As ground for such motion plaintiff contends defendant's statement of the case in its brief "is intermingled with argument and with conclusions" in violation of our Rule 1.08. That motion was taken with the case. While defendant's statement in [766] its brief includes some irrelevant and merely formal matter, some argument and conclusion of the brief writer, and while it is not all that could be desired as a "concise statement of the facts without argument", as to the situation of the instant case we are able to glean from the statement the facts determinative of the sole issue upon this appeal. We have concluded that we should not here apply the harsh remedy of dismissal. Therefore, the motion to dismiss the appeal is overruled.

Plaintiff pleaded both primary negligence and a violation of the humanitarian rule in a failure to warn by sounding the whistle. But abandoning other pleaded negligence plaintiff submitted her case to the jury solely upon the above noted humanitarian theory. At the close of the evidence adduced by plaintiff, defendant offered its motion for a directed verdict, and standing upon such motion, offered no

evidence. It here insists the trial court erred in overruling that motion. Specifically, defendant contends the record evidence fails to make a submissible case, in that it neither appears nor is it inferable from the record facts that deceased was oblivious of the approach of the train until such time as it was too late to sound a warning and avoid the collision. Plaintiff contends the contrary is true.

These contentions call for a detailed statement of the facts of record. Under these circumstances we herein state and consider the record facts and the reasonable inferences therefrom in the light most favorable to the jury's verdict and give plaintiff the benefit of every favorable inference the evidence tends to support.

Hamilton, a public street, extended east and west but immediately east of the railroad jogged slightly north and then continued east. The railroad at that point ran generally north and south (slightly east of north and slightly west of south). Both north and south of Hamilton Street the railroad track was straight for some distance. From the north, Osteopathy, another public street, ran south into and ended at Hamilton Street and intersected the north side of Hamilton just a few feet west of the railroad crossing. Both streets were paved and level. The crossing was level and the day was clear. From Hamilton Street west of the crossing the view to the south along the track was clear and unobstructed after one going east on Hamilton passed to the east of a grocery store which was located 78.5 feet west of the railroad track and on the south side of Hamilton. In the general neighborhood of the crossing there were houses on both Osteopathy and Hamilton except as above noted. There was much traffic over the crossing.

The railroad track approached Hamilton Street from the south up a slight grade but at a point on the tracks 450 to 500 feet south of Hamilton the view of Hamilton Street was clear to the west for 78.5 feet. From that point on west on Hamilton Street the view along Hamilton Street was obstructed by the grocery store and other buildings. From the same points on the railroad track south of Hamilton the view was likewise clear and unobstructed to the north on Osteopathy Street. The speed of the approaching train was estimated at from 25 to 50 miles per hour. As the truck was attempted to be driven east upon the crossing the left front corner of the locomotive struck the right front corner of the Kirkpatrick truck. Plaintiff's husband was alone in the truck. The impact threw the truck up in the air and down onto the west side of the right of way.

While other witnesses also testified, only two persons saw the truck before the actual impact of the collision. We note their testimony with particularity.

Joe Gillespie was operating a truck east on Hamilton Street. When he was a half block west of the crossing he stopped preparatory to turning north into an alley running north from Hamilton. While

Gillespie was stopped at that point plaintiff's husband passed Gillespie driving on east on Hamilton toward the railroad track in his (Kirkpatrick's) truck. Gillespie had known Kirkpatrick nine years. As the latter passed going east they exchanged greetings. Gillespie testified Kirkpatrick "never was going over eight or ten miles [767] an hour"; that "within a few feet of the track he (Kirkpatrick) slowed down"; that "he (Kirkpatrick) slowed down there at the crossing and he went on"; that he (Gillespie) could not tell whether Kirkpatrick looked for a train when he slowed down at the crossing, "you couldn't hardly tell,—but he slowed down to look, I know. Q. And then he proceeded on? A. Yes, sir". Gillespie further testified he heard no whistle or warning given by the train at any time.

Gilbert Palmer, also called as a witness by plaintiff, testified that he was the head brakeman of the train and was riding in the left (west) seat of the locomotive cab; that approaching the Hamilton Street crossing from the south his view to the west of the track on Hamilton Street was unobstructed to the grocery store, "around eighty feet" west of the track; that the Kirkpatrick truck, however, came south down Osteopathy Street to Hamilton Street; that he first saw Kirkpatrick's truck 100 feet from the crossing; "And what, if anything did you do then? A. Not a thing at that time, sir. Q. The car was coming toward the crossing? A. Yes, sir. Q. And you did nothing about it? A. At 150 yards, no sir. Q. And the train proceeded on there, and the car came on? A. Yes, sir. Q. And did they strike together? A. Yes, sir. . . . Q. Did you hit the front —did the front of the car and the engine come together? A. We hit the right front side. . . . Q. And this car was still in an angle, was it? A. No, he had made the turn on to Hamilton, off of Osteopathy". Palmer testified the regular crossing whistle was being blown by the engineer as the train approached and passed over the crossing.

Palmer further testified: "Q. As you ride in the engine, what are your duties as head brakeman there, in coming through a town? A. Nothing other than watching the crossing. Q. What do you watch for at the crossing? A. People and vehicles. Q. If you see people in vehicles what do you do? A. Well, if I happen to holler at every man I see or automobile I see, we would be stopping all the time. Q. What do you do? A. Nothing. Q. You don't do a thing? A. Only just set there and watch them." He also testified the Kirkpatrick truck while on Osteopathy Street could turn either west on Hamilton or east on Hamilton toward the track; that its speed was "around ten miles an hour"; that "he (Kirkpatrick) was slowing down all the time"; that his speed was always so slow that he could have stopped in three or four feet; that as Kirkpatrick approached the crossing his truck was slowed down "as if it was stopping", but it started on again; that there was not sufficient time after Kirk-

patrick started up, after he had slowed down near the crossing, to give the engineer any information before the collision; that for a quarter of a mile the automatic bell ringer had been ringing the bell on the locomotive; that the appliances to blow the whistle or stop the train were all on the other side (east side) of the cab; that the engineer was seated on the east side of the cab, six or eight feet away; that after the locomotive was within three or four hundred feet of the crossing the extension of the boiler on the engine out in front prevented the engineer from seeing any traffic west of the crossing; that he and the fireman both "hollered (at the engineer) and we hit"; that although there was nothing between him and the engineer the latter could not hear him hollering because the crossing whistle was then blowing.

Other than Gillespie and Palmer no witness saw either the train or the Kirkpatrick truck until after the collision had occurred.

The sole question presented on this appeal is, do these facts or any inferences favorable to plaintiff require the trial court to submit the case to the jury?

It is noted that Gillespie and Palmer disagreed as to which street it was upon which Kirkpatrick approached the point of [768] this tragedy. Palmer testified Kirkpatrick came south on Osteopathy Street, turned left and east on Hamilton, slowed down as though to stop, then started up and was struck by the train. Gillespie testified Kirkpatrick was at all times east bound on Hamilton Street, and when "within a few feet of the track" slowed down, then started up and was struck by the train. It is not here required that such factual question be determined. For the purpose of the issue to be ruled upon this appeal we are not concerned with whether Kirkpatrick came south on Osteopathy Street or came east on Hamilton Street. But we are concerned with determining where he was when his peril arose, when it was the defendant had a duty to warn, and whether a warning could thereafter have been given in time to have avoided the collision.

The undisputed testimony as to how the collision occurred is that Kirkpatrick, driving at only 8 to 10 miles an hour, and at all times able to stop within 3 or 4 feet, and "slowing down all the time", came to "within a few feet" of the track, slowed down, and then started up to cross the track, and was immediately struck. The railroad crossing sign immediately before him and the railroad track itself was a warning of danger. In failing to see the approaching train plainly visible before his eyes if he had looked and in failing to stop instead of driving into certain collision with the locomotive Kirkpatrick was conclusively negligent.

However, under the humanitarian rule, the beneficent principle of "extreme regard for human life" causes the law to disregard the negligence which "brings about or continues the situation of peril" (Banks v. Morris & Co., 302 Mo. 254, 257 S. W. 482), but, of course,

1254

the protection of the humanitarian rule is not extended to one who with knowledge of danger willfully or wantonly rushes into it.

"Position of peril" or "imminent peril" as applied to the humanitarian doctrine does not mean a bare possibility of danger. It means a certain peril, a place where danger is imminently impending. Wallace v. St. Joseph Ry., Lt. Ht. & Pr. Co., 336 Mo. 282, 77 S. W. (2d) 1011; Branson v. Abernathy Furn. Co., 344 Mo. 1171, 130 S. W. (2d) 562; Thomasson v. Henwood, 235 Mo. App. 1211, 146 S. W. (2d) 88.

Plaintiff invokes the presumption which the law indulges against suicide. There is no contention by any one that Kirkpatrick, knowing that the train was approaching, drove into collision with the train. But the record tends to establish that while he was in fact oblivious to the approach of the train, the movement of his truck, in slowing as if to stop, indicated he was aware of its approach.

Obliviousness to impending danger is always a constitutive element of a humanitarian case of failure to warn. Pentecost v. St. Louis Merchants' Bridge Term. R. Co., 334 Mo. 572, 66 S. W. (2d) 533. Our courts have often stated that: "'It is not enough that the defendant should see the plaintiff in a position which would be dangerous were the plaintiff not aware of what is going on. The defendant must also realize or have reason to realize that the plaintiff is inattentive and, therefore, is in peril. The defendant is entitled to assume that the plaintiff is paying or will pay reasonable attention to his surroundings; until he has reason to suspect the contrary, he has no reason to believe that the plaintiff is in any danger. Therefore, the defendant is liable only if he realizes or has reason to realize that the plaintiff is inattentive and consequently in peril. *Thus, if an engineer of a train approaching a level highway crossing sees a traveler approaching the track on foot or in a vehicle, he is not required to take any steps either to warn the traveler by an additional blast of his whistle or to bring the train under special control, since he is entitled to assume that the traveler has discovered or will discover the oncoming train and will stop before reaching the crossing.'*" (Italics ours.) Womack v. Missouri Pacific R. Co., 337 Mo. 1160, 88 S. W. (2d) 368; Thomasson v. Henwood, supra; Camp v. Kurn, 235 Mo. App. 109, 142 S. W. (2d) 772; Stark v. Berger, 344 Mo. 170, 125 S. W. (2d) 870; Poague v. Kurn, 346 Mo. 153, 140 S. W. (2d) 13. But if the demeanor of the approaching traveler be such as to indicate to a reasonably prudent [769] person in the position of the trainmen that the traveler is or may be oblivious, the trainmen must take such steps as a reasonably prudent person may consider necessary. And when peril arises, such steps must, in any event, be taken.

Whether Kirkpatrick moved south upon Osteopathy Street or east upon Hamilton Street to this collision all the evidence is that his speed was only 8 or 10 miles per hour, that at any time he could stop in 3 or 4 feet and that all the time he was slowing down. When

"within a few feet" of the crossing he slowed down to his lowest speed, then started forward to the almost instantaneous collision. Neither eye witness undertook to state in feet how close it was to the track that he slowed to his lowest speed and then began to accelerate his speed to go on across the tracks. "Few" means "not many; of small number". It is an indefinite expression for a small or limited number. Pittsburg, C., C. & St. L. Ry. Co. v. Broderick, 102 N. E, (Ind.) 887, 893; U. S. v. Margolis, 138 Fed. (2d) 1002, 1003. In any event the record before us shows he was quite close to the track. Such a low speed while approaching, and the continued deceleration of that low speed indicated Kirkpatrick's intention to stop before crossing. From the movement of Kirkpatrick's truck, it would have reasonably appeared obvious to Palmer, and would have been so to any reasonably prudent person observing him, that Kirkpatrick was conscious of the oncoming train and intended to stop and let the train pass. Under the instant facts Kirkpatrick did not enter a position of peril until his truck reached a point so near the west rail that it could not be stopped before coming within the overhang of the locomotive. It was not until he reached his lowest speed and then thereafter accelerated his speed to go on across that there was any indication to any one that he was in fact oblivious to the danger of the oncoming train. It was at that instant that peril arose. It was at that instant that the duty to warn arose.

Plaintiff argues that, assuming Kirkpatrick came from the east on Hamilton Street, he was in peril when he first could have been seen 78.5 feet west of the crossing. We cannot agree to that contention for reasons we note above.

It is apparent from the record facts that at the time the duty to warn arose Kirkpatrick was within only a very few feet of the overhang of the locomotive. Under every possible inference from these facts only a second or two, possibly less, thereafter elapsed before the actual collision. When Kirkpatrick started forward, Palmer and the fireman hollowed to the engineer. All the appliances for warning and slowing down were on the engineer's side of the cab of the locomotive. It is plain from these facts that there was no time to convey information to the engineer in time for a warning signal to have been given in time to have averted this collision. Kirkpatrick had made that impossible when he started forward at accelerated speed from a point so close to the rail. To make a submissible jury case under the theory submitted in plaintiff's instruction 1 the evidence must disclose that a reasonably sufficient time was afforded, after peril was discoverable, during which time it was reasonably possible for the whistle to have been sounded, for Kirkpatrick to have heeded the blast of the whistle and to have stopped short of the collision. Stark v. Berger, supra; Thomasson v. Henwood, supra; Camp

v. Kurn, supra; Smith v. Siedhoff, 209 S. W. (2d) 233; Poague v. Kurn, supra.

We have carefully examined the cases cited by plaintiff. Her argument and the cases she cites are founded upon her own interpretation of the testimony we state and quote above. She urges us to ignore the record testimony of her witnesses, Gillespie and Palmer, to the effect that Kirkpatrick slowed down within a few feet of the track. Plaintiff urges that Gillespie's testimony be discarded because Gillespie was substantially directly west of Kirkpatrick's east bound truck; and that we should judicially notice that because of his location Gillespie's testimony that Kirkpatrick "slowed down there at the crossing" lacks probative value. That we cannot do. Rereading and close analysis of the unequivocal testimony of Gillespie [770] and Palmer compels the conclusion that the case should not have been submitted to the jury. As above noted, Palmer's testimony, in all the matters essential here, verifies and supports that given by Gillespie. Palmer's testimony must be considered in its entirety. He was plaintiff's witness but his testimony does not take plaintiff's case to the jury. On the contrary, it demonstrates, as does Gillespie's testimony, that until Kirkpatrick accelerated the speed of his truck when within a few feet of the track those on the locomotive had no reason to suspect he was oblivious to his danger, and that thereafter there was no time or opportunity for the enginemen to have averted the collision. There is no testimony to the contrary in the record. Plaintiff's contentions respecting her interpretation of the testimony are not supported by the record in the case and must be overruled.

We cannot escape the conclusion that the trial court erred in overruling defendant's motion for a directed verdict and in submitting the case to the jury, and we so rule.

It appearing that the case has been fully developed as to facts, and that plaintiff cannot in any event recover, the judgment of the circuit court is reversed with directions to enter a judgment for the defendant. It is so ordered. All concur.