[1] This is an action for damages for personal injuries sustained by plaintiff, Alma Redden, when she was struck by an automobile owned and operated by defendant, Adolph Boehmer.
[2] The accident happened in the early evening of December 18, 1946, at a point on the public highway which runs through the village of Rich Fountain, in Osage County, Missouri.
[3] Upon a trial to the court alone without the aid of a jury, the court rendered judgment in favor of plaintiff, and against defendant, for the sum of $2,000. Following an unavailing motion to set aside the judgment or, in the alternative, to grant him a new trial, defendant gave notice of appeal, and by subsequent steps has caused the case to be transferred to this court for our review.
[4] In her petition plaintiff charged defendant with four specifications of primary negligence along with negligence under the humanitarian doctrine.
[5] The assignments of primary negligence were, first, that defendant permitted his automobile to swerve and be driven across the footpath upon which plaintiff was allegedly walking; second, that he operated his automobile at a dangerous rate of speed under the circumstances; third, that he failed to keep a reasonably sufficient lookout; and fourth, that he failed to operate his automobile with proper headlights.
[6] The assignment under the humanitarian doctrine was the conventional charge that defendant saw, or by the exercise of due care and caution could have seen, plaintiff in a position of imminent peril and danger of being struck and injured by his automobile in time thereafter, with the means and appliances at hand, and with safety to himself, to have stopped his automobile, turned the same aside, or slackened its speed, and thus have avoided colliding with plaintiff, but carelessly and negligently failed to do so.
[7] The answer was a general denial of each separate charge of negligence, coupled with a plea of contributory negligence on plaintiff's part in allegedly moving over into the path of defendant's automobile when it was too late for him to avoid a collision.
[8] Coming down a hill to the west of the village, the highway on which the parties were traveling runs directly through the village to the east. The highway proper is blacktop 20 feet in width, with level gravel shoulders on either side.
[9] The accident happened around 6:30 o'clock in the evening, which is dark at the particular season of the year. Plaintiff and her husband were walking westwardly at the edge of the blacktop on the north side of the road on their way to a birthday party at the home of one Ben Dressel, who lived to the west of the village. Passing a cafe, the husband stopped in to purchase some cigarettes, while plaintiff walked on alone until her husband might overtake her.
[10] An eastbound school bus driven by one Edwards came down the hill into the village and was stopped and parked in front of a store on the south side of the highway. Following some 400 or 500 feet to the rear of the bus was defendant's *Page 129 
automobile, a 1929 Whippet. As Edwards pulled his bus to the side of the road, he glanced in his rear vision mirror and saw the reflection of defendant's lights behind him. There is no question but that defendant was driving slowly, and it was shortly after he had overtaken and passed the bus that his car came in contact with plaintiff at some disputed place on the highway. After striking plaintiff, defendant pulled off and parked on the north side of the highway about 40 or 50 feet beyond the point of the collision, and then came back to render whatever assistance he could in seeing that plaintiff received proper medical attention.
[11] The case was submitted on all the issues along with a request by defendant that the court, in some appropriate manner, indicate the ground for its decision. Laws Mo. 1943, p. 388, sec. 114(b), Mo.R.S.A. § 847.114(b). The court thereupon announced that its finding would be in favor of plaintiff under the humanitarian doctrine; and the propriety of such decision is the chief point in controversy on this appeal.
[12] Since the case was tried to the court alone without the aid of a jury, it is to be reviewed by this court upon both the law and the evidence as in suits of an equitable nature. Laws Mo. 1943, p. 388, sec. 114(d), Mo.R.S.A. § 847.114(d). The question for our determination is therefore not merely one of whether the court's finding was supported by substantial evidence. On the contrary, it is our duty to make our own independent finding of the facts and reach our own conclusion as to where the weight of the evidence lies. Whatever findings the lower court may have made are in no sense binding upon us, although in matters where the evidence is conflicting and close we shall have due regard for the lower court's opportunity to judge the credibility of the witnesses.
[13] Plaintiff and defendant were the only eyewitnesses of the accident, and plaintiff's own account of it was quite confusing and unsatisfactory.
[14] According to plaintiff's testimony, she first saw defendant's approaching automobile when it was only 40 or 50 feet away from her, and observed that it was being driven on the north or wrong side of the road for an automobile proceeding eastwardly. However her husband testified that she had previously told him that she had seen the automobile coming down the hill at a point which he estimated as being more than 250 feet to the west. It will be recalled that plaintiff was walking along the north edge of the blacktop, and she testified that she stayed in that position until "just before and practically at the time of this accident" when "he swung over on my side, and when I thought he was coming over on my side, I tried to dodge him, and I was zig-zagging back and forth". She did not attempt to say how close defendant had come to her by the time he swung over towards her, but she later testified that she had assumed that he was going to stop and park to the north of the highway, and that it was then that she had "started on across the road". Nevertheless she insisted that she was still on the edge of the road when she was struck, and not in the center of the highway as the other evidence tended to disclose. For instance, her own witness Edwards, the driver of the school bus, testified that immediately upon hearing the noise of the accident he had come out of the store to lend his assistance, and that plaintiff "was just about as near the middle of the blacktop as she could be".
[15] Defendant's account of the accident differed from that of plaintiff in many material respects.
[16] Defendant testified that he had come down the hill at a speed of from 15 to 18 miles an hour approximately 400 feet to the rear of the school bus. Edwards had previously testified that defendant "wasn't driving fast", and so also had Dressel, another of plaintiff's witnesses, who had observed defendant driving down the hill and recalled that he was "coming right slow". While because of wartime shortages defendant had been compelled to improvise one of the headlights of his car, he testified that his lights were none the less adequate, and that they shone brightly *Page 130 
enough for him to distinguish objects from 150 to 225 feet ahead.
[17] As he approached the point where the school bus was parked, defendant pulled over from the south side to the center of the road to go around the bus, and at that moment first saw plaintiff walking in his direction on the north side of the highway 150 to 175 feet away. Seeing her start out into the road as though she were going to cross to the south side, defendant applied his brakes and slackened his speed, and then observing that she had seen his car and had stepped back, he directed his attention to the bus to see if there might be any children alighting from it.
[18] When he again looked toward plaintiff, defendant noticed that she had made a second start to cross the street. By that time he was within 50 or 60 feet of her, and was traveling about 15 miles an hour. He testified that if she had continued on her course, he would have had room to clear and no accident would have happened, but that when she reached the middle of the road, she stopped directly in his path. The distance separating the two of them had of course been steadily decreasing while plaintiff had progressed to the center of the highway, and when she stopped, defendant immediately did everything in his power to avoid striking her by turning first to his right and then to his left. Unfortunately plaintiff herself began stepping forward and then backward, and notwithstanding everything defendant could do by way of slackening his speed and swerving his car, he finally struck plaintiff with his right front fender "practically in the center of the road". He then drove over to the north shoulder and stopped, not because he could not have stopped his car sooner, but in order to leave the road open for any other traffic that might have happened to come along.
[19] The facts and circumstances of the case tend strongly to support defendant's version of how the accident occurred. There were material inconsistencies in plaintiff's case, and, as we have already pointed out, she was contradicted in vital respects by certain of her own witnesses. Her own account of the accident was so confused that if one were forced to depend upon her testimony alone, it would even be hard to determine upon which side of the road she was walking as defendant's automobile approached her from the west. As a matter of fact, the trial court experienced that very difficulty, and in order to satisfy itself regarding the true situation was forced to inquire of Edwards, the driver of the bus, who informed the court that he had come east on the right or south side, and that plaintiff was walking on the opposite side from where he was, which would therefore have been the north side of the highway.
[20] In determining a defendant's liability under the humanitarian doctrine, the question of when the plaintiff came into a position of imminent peril is necessarily a matter of chief concern. This for the reason that it is the fact that the plaintiff is placed in a position of imminent peril which imposes the duty on the defendant to act to save him from the consequences. Negligence under the humanitarian doctrine results from the defendant's failure to perform such duty where he has the present ability, with the means at hand, to avert the impending injury. Steuernagel v. St. Louis Public Service Co., 357 Mo. 904,211 S.W.2d 696; Blaser v. Coleman, Mo.Sup., 213 S.W.2d 420. But he is under no duty to act until after the situation of imminent peril has come into existence, Yeaman v. Storms, Mo.Sup., 217 S.W.2d 495; and the peril is not imminent unless it is certain, immediate, and impending. Blaser v. Coleman, supra. In other words, it is not enough to show a position of imminent peril if the danger is only remote, uncertain, or contingent; and a mere likelihood or bare possibility of injury will not suffice to bring the case within the humanitarian doctrine. Blaser v. Coleman, supra; Kirkpatrick v. Wabash R. Co., 357 Mo. 1246,212 S.W.2d 764.
[21] Furthermore the limits of the danger zone in any given case are directly affected by whether or not the plaintiff is aware of the approach of the instrumentality under the defendant's control. The cases recognize that where the plaintiff *Page 131 
is not oblivious and has the ability to stop, he is not in a position of imminent peril while he is merely moving toward the path of the defendant's approaching vehicle, and does not come into a position of imminent peril until he is directly in its path or so close thereto that he cannot stop before actually getting into its path. Smithers v. Barker, 341 Mo. 1017, 111 S.W.2d 47.
[22] In this case the evidence discloses that plaintiff was in no sense unaware of defendant's approach. Even though she testified that when she first saw defendant's automobile, it was within 40 or 50 feet of her, such testimony was thoroughly refuted by her husband's testimony that she had told him shortly after the accident that she had seen the automobile coming down the hill several hundred feet to the west of the village. It was with such knowledge on her part that she made her second and final start across the highway when defendant's automobile was only 50 or 60 feet away and approaching at a speed of approximately 15 miles an hour.
[23] While plaintiff was proceeding towards the middle of the highway, her peril was at most only remote, uncertain, and contingent, and not of such a character as to compel action by defendant within the dictates of the humanitarian doctrine. Furthermore, if she had continued on her course, she would have passed beyond defendant's path, and there would have been no accident. But when she reached the middle of the highway, she became confused and stopped directly in his path. It was then that her peril first became certain, immediate, and impending so as to have imposed the duty upon defendant to take steps to avert a casualty, but by that time it was impossible for him to avoid striking her with her zigzagging back and forth in front of him as he attempted to swerve first in one direction and then in the other. The decided weight of the evidence indicates that after she came into a position of imminent peril, defendant had no opportunity to save her, and a recovery for plaintiff is not to be sustained upon the theory of negligence under the humanitarian doctrine.
[24] It does not appear whether the lower court, in announcing that it was finding for plaintiff under the humanitarian doctrine, meant to hold that she was not entitled to recover upon any one of her specifications of primary negligence. However the fact is that the court did not hold for her upon any such theory of liability, nor in our opinion would it have been justified in doing so. The evidence was all agreed that defendant was driving at a moderate rate of speed. Furthermore, whatever the unusual manner in which his headlights had been improvised, he nevertheless could and did see plaintiff ahead of him for a distance of some 150 to 175 feet. It was not the insufficiency of his headlights, or any failure on his part to keep a lookout, that brought about the injury, but instead the accident proximately resulted from plaintiff's own intervening act in stopping in the middle of the highway directly in his path, when he was so closely upon her that he had no chance to avoid a collision.
[25] It follows that the judgment rendered by the circuit court should be reversed; and the Commissioner so recommends.