FLORENCE HILLHOUSE, Administratrix of the Estate of ROLLIE EVERETT DAVIDSON, Deceased, Respondent, v. GUY A. THOMPSON, Trustee of the MISSOURI PACIFIC RAILROAD COMPANY, a Corporation, Appellant, No. 42720—243 S. W. (2d) 531.

Court en Banc, November 12, 1951.

*Thomas J. Cole* and *E. A. Barbour, Jr.,* for appellant.

702

*Charles E. Ginn* and *Jo B. Gardner* for respondent.

ELLISON, C. J.—This case comes here on transfer from the Springfield Court of Appeals under Sec. 10, Art. V, Const. Mo. 1945. The opinion of that court is reported in 240 SW. (2d) 224, where the facts are more fully stated. The suit was for $15,000 damages under Sec's 537.080 and 537.090, R. S. 1949, Laws Mo. 1945, p. 846, for the alleged wrongful death of the plaintiff-respondent administratrix's intestate, Rollie Everett Davidson on August 26, 1949, when the Ford pick-up truck which he was driving was struck by defendant-appellant's passenger train at a rural highway grade crossing in Lawrence County. On change of venue the cause was transferred to Christian County for trial. The jury returned a verdict for $6000.

The cause was reversed and remanded by the Springfield Court of Appeals on the ground that the plaintiff's action was based on both primary negligence and the humanitarian doctrine, and was "questionable" on the facts, with a "mass of testimony" introduced bearing only on the primary negligence theory, which was later abandoned and the case submitted to the jury on the humanitarian theory alone. The Court of Appeals held the foregoing extraneous testimony on primary negligence may have affected the jury's verdict; that respondent's main instruction No. 1 went beyond the evidence in requiring the jury to find *both* that appellant's engineer gave timely warning *and* slackened speed, since the respondent failed to make a case for the jury on the former; and that the only issue presented to the jury should have been whether the appellant's engineer could have seen the deceased in imminent peril in time to have averted the collision in the exercise of due care by slackening the speed of the train.

The cause is submitted here by both parties on their briefs filed in the Court of Appeals. Appellant-defendant's assignments of error complain of: the trial court's refusal to direct a verdict for it at the close of the plaintiff's case and the whole case; the admission of improper evidence; the giving of an improper instruction; insufficiency of the evidence; and excessiveness of the verdict. Since the case turns largely on the sufficiency of the evidence, the facts must be stated at some length.

The railroad track emerged from a cut on the north and ran south 52° east downgrade, on a fill 5 to 7 feet high according to several witnesses. Paralleling its west side, and some 116 to 125 feet therefrom, was State Highway 39. A black top road about 14 feet wide, called *High Street* and leading to Aurora, branched off from State Highway 39 and ran upgrade practically due east across the railroad track and continued downgrade on the other side, making about the same angle of 52° therewith and with Highway 39. Plaintiff-appellant's evidence showed the following.

Just preceding the casualty about 7:30 A.M. on August 26, 1949, a witness Durard Prater was driving *west* in his automobile on High Street toward the railroad track, with witnesses Mrs. Thurman and Mrs. Murphy as passengers. He testified that as he reached a point about 5 feet east of the track going 15 miles per hour he saw the train approaching from the north. It was distant 175-200 feet. The two women severally estimated the distance at 250-300 feet and 3 telegraph poles (528 feet). Prater slowed up but concluded he was too close to stop, and speeded west across the track ahead of the train. On the other side he met and passed the deceased's truck coming *east* up High Street toward the railroad track at about 12-15 miles per hour. The truck was about 15 feet long.

Prater thought the two vehicles passed each other about 20 feet west of the track. One of his two women passengers, Mrs. Murphy, said it was just after they had crossed the track. The other, Mrs. Thurman, said on direct examination it was half-way between the track and Highway 39—a westerly distance of about 60 feet from the track. On cross-examination she refused to estimate the distance. Prater and the two women thought the deceased had got across the track safely ahead of the train, and proceeded on to Mt. Vernon where they learned of the casualty.

With reference to warning signals, Prater testified he didn't hear the train whistle until after he had got across the track, and that was a low whistle. He didn't hear the bell ring or any engine noise as he approached the track, though he listened. Mrs. Thurman testified she didn't hear the whistle or bell or any train noise until after they had crossed the track and just about as they were passing deceased's truck, and then it was a faint whistle which she barely heard. She thought the train was running 15 or 20 miles per hour. Mrs. Murphy

said Prater's automobile was fairly close to and on the east side of the track when she saw the train coming. She did not hear the locomotive whistle until immediately after they had crossed the track. It was a short whistle.

The fourth eyewitness, Pfetzner, was seated in a truck parked on Highway 39 at the foot of High Street, 168 feet west of the railroad track. He estimated the deceased's truck was moving east up High Street about 15 miles per hour, and that it passed Prater's car, coming west, about 10 or 15 feet west of the railroad track. Pfetzner didn't hear the train coming until the whistle was sounded about 135 feet north of the crossing. The bell was not ringing. He tried to warn the deceased by "honking" the horn of his truck. The train hit the last 3 feet of deceased's truck. He couldn't estimate the speed of the train, but its rear end stopped 591 feet south of the crossing. The next day with one of respondent's counsel, Mr. Ginn, he made an investigation and found no sand along the railroad rails north of a point 471 feet south of the High Street crossing. Nor was there any sand north of the crossing.

After the casualty this witness Pfetzner talked to a neighboring farmer, named Huellhorst. The latter testified the conversation occurred closely following the casualty and that Pfetzner commented on the hardship inflicted on respondent's family; asked him, Huellhorst, if any attorney had been to see him; and said "if we stick together it would look better." Pfetzner acknowledged having had a conversation with Huellhorst four months later, but denied the foregoing conversation. However, he admitted that four or five days after his foregoing investigation with Ginn he had been interviewed by a railroad claim agent, Starrett, and refused to give him a statement, though he admitted to Starrett he had given a statement to attorney Ginn. His excuse to Starrett was that there was no use of his giving two statements, and that he had heart trouble.

Engineer McNabb on the 5-car steam locomotive passenger train involved was used as a witness by plaintiff-respondent at the trial. He was seated on the right (west) side of his cab and the fireman on the left. The engine had high speed braking equipment and a sander which were in good order. The visibility was good and the track dry. He could see High Street and the deceased's truck approaching thereon. His speed restriction (by company rule?) was 59 miles per hour.

About a half mile south of the High Street crossing there is an interlocker switch and derailer near Aurora, where the Missouri Pacific crosses the Frisco Railroad. The speed limit thereover is 20 miles per hour. Because of that there is a 35 miles per hour speed sign north of the High Street crossing, which is cautionary and not controlling. The crossing whistle X board for High Street is close

to the 35 mile post and some 1350 feet north of the crossing. From the X post the engineer must sound the whistle until he has gone over the crossing.

McNabb said he was running 59 miles per hour back where the 35 mile board was, and he made a service application of the brakes, reducing the speed to 50 miles per hour. The track there is about 1% downgrade. He saw the deceased's truck proceeding east up High Street toward the railroad crossing, but thought it had stopped. He couldn't say how far north his engine was then, because Prater's westbound automobile suddenly went over the track and apparently wasn't going to make it.

He immediately put the brakes in emergency probably 200 or 300 feet from the crossing for the Prater automobile. The train was then travelling 45 to 50 miles per hour. He didn't close the throttle entirely because he was not supposed to. Also he turned on the sander and left it on until the train stopped. Upon inspecting the locomotive and train for wreckage after the collision he saw sand on his side under the engine. He said there isn't much sand under the wheels after they have run over it, because it is blown away by train suction. The train traveled 1500 feet after the collision, which he considered a good stop considering the declining grade.

The engineer was interrogated on direct and cross-examination by counsel for respondent, and also by appellant's counsel, concerning his foregoing trial testimony that the train was *200 or 300* feet from the crossing when he applied the emergency brakes and turned on the sander. Respondent's counsel showed that in a previous deposition he had said his locomotive was 20 or 30 feet back from the crossing when he first saw Prater's automobile approaching, and *10, 12 or 15* feet therefrom when he applied the emergency brakes because of the rapid approach of that automobile. The engineer answered there must have been some mistake about the meaning of that question in the deposition, and that he had his brakes in emergency because of the Prater automobile before he hit deceased's truck.

On cross-examination by appellant's counsel the engineer said the deceased's eastbound truck was 30-35 feet west of the crossing when he first saw it, and he thought it was stopped or would stop. When he saw the westbound Prater automobile closely approaching or on the track he paid no more attention to deceased's truck, and applied the emergency brake. In this testimony he estimated his locomotive was *100* feet back from the High Street crossing when the emergency brake was applied, and again said the distance of 10-15 feet given in his deposition must have been wrong. Further he said there was nothing more he could have done to save the deceased. When the locomotive was *200* feet back from the High Street crossing and the deceased's truck was hidden from his view by Prater's passing automobile he thought the deceased was not in danger, and didn't realize the con-

trary until the truck emerged and speeded up about 10 feet from the track.

On re-direct examination respondent's counsel showed that in the engineer's deposition he said the deceased's truck was proceeding at a steady speed not exceeding 10 or 15 miles per hour before it passed the Prater automobile. Then counsel asked him when the truck accelerated that speed ▆▆▆ and the engineer answered it was when it emerged from behind the automobile and "made a run for the crossing" at over 10 or 15 miles per hour "or faster" when he saw him *behind* the Prater automobile, and the front of his "car" (truck?) was about 10 feet from the track. The engineer thought his locomotive then was 25 or 30 feet from the track. He could not remember seeing deceased, himself, in the truck at that time, but in his deposition he said he could see the deceased plainly—the side of his face—but didn't see him look toward the locomotive.

Further respondent produced a retired locomotive engineer, Smallenberger, as an expert witness. He had visited the locus in quo, and testified that if sand had been deposited on the dry rails under the wheels of a train such as that here involved, traveling south 59 miles per hour, and a 12 pound service application of the air brakes had been maintained, beginning at the X whistling post for the High Street crossing, the train speed would have been reduced to 12 or 15 miles per hour over that crossing. If under the same conditions an emergency application of the air brakes had been made, including reaction time, the train would have stopped in 1200 feet.

If, *without* a previous service application of the air brakes, an emergency application were made on the same train 300 feet north of the crossing, the engineer's reaction time would be 2-1/2 seconds and the train speed would be reduced only 5 miles per hour. If the brakes *already* were in service application, and an emergency application were made 100 feet north of the crossing, the train would arrive at the crossing 2 seconds later than if the emergency application had been made 12-15 feet therefrom, and its speed would be reduced to 35 miles per hour. Assuming the service application were made 75 feet from the crossing, and the emergency application were added 10 to 15 feet therefrom reducing the train speed to 50 miles per hour, that speed would be 20 miles per hour faster than if the emergency application also had been made 75 feet from the crossing. In other words, under this latter hypothesis the train speed would be reduced to 30 miles per hour.

For appellant a civil engineer in its employ testified he had made a survey and plat of the railroad track and Highway 39, including the High Street crossing, which showed that at the junction of the two vehicular roads the deceased could have seen up the track 900 feet. From a point on High Street 100 feet west of the track he could have seen thereup 220 feet; within 50 feet, 1200 feet; and within 25 feet,

1500 feet. The X whistling post is 1892 feet north of the High Street crossing, and the 35 miles speed warning post, 1756 feet.

In addition to engineer McNabb on the train involved, appellant produced nine witnesses who testified as to the warning signals sounded by the train. Four of these were railroad employees: the conductor, fireman and porter on the train, and another conductor riding deadhead. The brakeman was ill in the hospital and did not appear as a witness, nor did the Pullman porter. The remaining 5 were persons living in the vicinity at the time of the casualty.

Of the latter, a Mrs. Hicks and her landlord Bonda Herndon resided in a farm house near a school house located about 400 or 500 feet south of the High Street grade crossing. Witnesses Huellhorst and Flowers were working at the school house. And witness Jester lived at Aurora. Without going into detail as to slight variances in their testimony all said they heard the train whistle about continuously from quite a way back, until it passed the High Street crossing. Mrs. Hicks heard a "swish" and afterward went to the scene of the collision. Mr. Herndon, in the same house, was awakened by the whistling, saw the locomotive coming and heard "the wreck." He said the train stopped ¼ or ½ mile below the crossing. Neither Huellhorst nor Flowers in the school house knew the collision had occurred until just afterward. Mr. Jester on his porch at Aurora, ½ mile from the High Street crossing, heard the train whistling, looked up, and saw the train. It was practically stopped 100 feet below that crossing. The whistle sounded like a "continuous blowing."

Conductor Vance, in charge of the train involved, heard the engine give the crossing whistle ¾ mile from the crossing. He also heard the station whistle and a few minutes later the engineer began to whistle practically continuously until the collision occurred. The engine stopped about 1500 feet south of the north side of the High Street crossing. He asked all the people on the train if they had seen or heard anything and they said "no."

Harry Hurst, the fireman, said the engineer whistled at the 3rd crossing to the north, as he passed the whistling board, 2 longs, a short and a long. Then he gave the station whistle, 1 long. From there on he whistled continuously until he reached the High Street crossing. The fireman saw the Prater automobile approaching that crossing from 200 to 300 feet back to the east. The locomotive was northward about the same distance. He thought that automobile would get across. It slowed down and then suddenly speeded up and did get by. He could not warn the engineer because he didn't have time and the whistling prevented the engineer from hearing him. He never saw the deceased's truck on the west side of the track.

The engineer had made a service application of the brakes about ¼ or ⅜ mile back from the crossing but the train speed was only reduced

to about 45 miles per hour. He went into emergency about as the back of the Prater automobile went over the left (east) rail of the track. The locomotive then was about 20 or 25 feet from the crossing and was going about 45 miles per hour when it hit the truck. The train stopped 1500 feet beyond. On cross-examination it was shown the fireman had said in a deposition that he was unable to say what whistles were made for any particular crossing.

Mr. Wolf, the deadhead conductor, testified the locomotive engineer first whistled for the crossing, 2 longs, a short and a long. Then he sounded one long blast and after that 2 longs, a short and a long, continuing until the collision. After the station whistle he made a service application of the brakes and while he was whistling for the High Street crossing he went into emergency.

Collins, the train porter, first heard the locomotive sound of the crossing whistle, altogether there were 2 crossing whistles and one station whistle.

The appellant's first assignment of error is that the trial court erred in overruling its motion for a directed verdict at the close of respondent's evidence and at the close of all the evidence. At the outset respondent relied on both primary and humanitarian negligence of the appellant, and she presented evidence on both theories. But after appellant's two motions for a directed verdict had been overruled she submitted her cause to the jury on the humanitarian theory alone. The argument in appellant's brief contends only that she failed to make a case for the jury on that theory. The general rule is that if a party has adduced in support of his case evidence which is substantial, when coupled with inferences that may be legitimately drawn therefrom, the case is for the jury and a motion for a directed verdict should be overruled. In other words, the court will not *weigh* the evidence.[1]

The evidence most favorable to the respondent, heretofore reviewed, was as follows. According to witness Prater the distance of the train from the High Street crossing was 175-200 feet when his automobile was at, or about 5 feet from, the railroad track. One of his women passengers said it was 250-300 feet away when they were crossing the track. The other said when they were "fairly close to the track" the locomotive was 3 telegraph poles (528 feet) northward.

The engineer said he saw the deceased's truck going east and the Prater car coming west and put on the emergency brake and sander 200-300 feet north of the crossing. But in a previous deposition he had said his left hand was on the brake valve, and that he made the emergency application 12 or 15 feet from the crossing. This latter fact he repudiated at the trial, as well as his statement on direct

[1]Wills v. Belger, 357 Mo. 1177, 1180, 212 SW. (2d) 736, 737(1); Bowers v. Etherton (Mo. Div. 2), 216 SW. (2d) 83, 86(3); Hardin v. Ill. Cent. Rd. Co., 334 Mo. 1169, 1179-80(2), 70 SW. (2d) 1075, 1079-81 (2-9).

examination that he had applied the emergency brakes 200 or 300 feet from the crossing. This time he said it was not over 100 feet. Nevertheless respondent was entitled to that version of his testimony which most nearly supported her warranted inferences from the facts.

As a part of respondent's case in chief her expert witness Smallenberger testified that if the brakes already were in service application (thus eliminating reaction time and slack in the train line) and an emergency application were made 100 feet north of the crossing, the train would arrive at the crossing 2 seconds later than if the emergency application had been made only 12-15 feet therefrom, that being the distance respondent's witness engineer McNabb had given in his deposition. He had also testified therein that as the deceased crossed the track he (the engineer) saw the side of his face, and if he looked toward the engineer the latter did not see him do it. And respondent's witness Pfetzner testified all but the last 3 feet of the deceased's truck had got across the track and the overhang of the locomotive—in other words, only the rear 3 feet was hit.

Under all the evidence, we think appellant's first assignment—that the trial court should have directed a verdict for it—was properly overruled by that court. In our opinion the respondent made a case for the jury under the decisions listed below,[2] along with others of like tenor which appellant also cites. This is true on the hypothesis that the brakes were set in emergency 100 feet north of the crossing, after having been in service application for nearly ¼ mile prior thereto. And this is all the more true if the emergency application was made 200-300 feet back from the crossing, as some of the testimony showed.

Appellant's next assignment is that the trial court erred in admitting the testimony of respondent's expert witness Smallenberger because it was "incompetent, inadmissible and immaterial." The only ground advanced on this contention is that the witness' testimony specified points on the track at various distances north of the highway crossing from which the train speed could have been retarded a given amount in rate or elapsed time by emergency and other applications of the locomotive brakes. Appellant asserts that under the law and the evidence there was no duty on the part of the engineer to make such applications at such points, unless and until the deceased was in a position of imminent peril and oblivious of his peril. But the *assignment* here does not specify the points and distances to which it is directed. And furthermore the witness did not even purport to pass on the question of when the deceased went into peril. We think the assignment is indefinite and without merit.

[2]Kirkpatrick v. Wabash Rd. Co., 357 Mo. 1246, 1253-6(2), 212 SW. (2d) 764, 768-70 (3-9); Poague v. Kurn, 346 Mo. 153, 161-5(4), 140 SW. (2d) 13-19 (3-10); Hilton v. Term. Rd. Assn., 345 Mo. 987, 993(4), 137 SW. (2d) 520, 522 (4, 5).

710

■ Appellant's third assignment is that the trial court erred in giving respondent's main instruction No. 1, because it unduly extended the range of the deceased's position of imminent peril, and made it include the time and place where he was only *approaching* a position of imminent peril. The instruction is long, and we quote only that part of it quoted in appellant's brief, as follows: "and if you further find that as deceased approached and went upon said railroad crossing ahead of said approaching train, he was then in a position of imminent peril and danger and was oblivious thereto, and that M. F. ·McNabb (the engineer) as an employee of defendant * * * saw and knew, or in the exercise of ordinary care, could have seen and known that the deceased was in such position of ■ imminent peril and danger, if so, and that he was oblivious thereto, * * *."

As will be seen, the instruction did not say the deceased was approaching a *position of imminent peril*. It merely stated that if the jury found the deceased, as he "approached and went upon the *railroad crossing* ahead of the approaching train, *was then* in a position of imminent .peril and oblivious thereto * * *." On this assignment the appellant cites the Kirkpatrick case, supra, 357 Mo. l. c. 1253-6, 212 SW. (2d) l. c. 768-70(4-9); Hilton v. Term. Rd. Assn., 345 Mo. l. c. 993-4(4-5), 137 SW. (2d) l. c. 522 (4, 5). Both these decisions do hold a party is not in imminent peril when he is only approaching such peril. But both also hold that when a party is oblivious of his peril, that fact may, under the facts of the particular case, extend the danger zone and make the peril imminent. In this case there was some evidence that the deceased was oblivious. The engineer said in his deposition that he saw the side of the deceased's face as the latter. crossed the track, and did not see the deceased look toward him. And the deceased's view of the train was shut off for a short time as the Prater automobile passed him.

. The decisions of this court decided concurrently herewith seem to be in point on the question here under consideration. They are Newman, admx. v. St. L. Pub. Serv. Co. Banc, No. 42680, 244 SW. (2d) 45, and Harrington v. Thompson, trustee, Div. I, No. 42294, 243 SW. (2d) 519. Both hold that a humanitarian instruction is not erroneous for failure to require a finding as to the exact place where the injured party came into peril. That is a question for the jury. And it may be, and usually is, some point in the injured party's *approach* toward the railroad or streetcar track before he gets on it.

■ The appellant's instruction No. 1 propounded two theories of humanitarian negligence—failure to warn and failure to slacken speed. In the view of the writer the case was properly submitted to the jury on both theories. There was substantial testimony that the locomotive did *not* sound warning signals. Witness Prater and one of the two women passengers in his automobile said they did not hear the locomotive bell or whistle until after they had crossed the

track just ahead of it. The other woman said the same as to the whistle. That was substantial evidence: Summa v. Morgan Real Est. Co., 350 Mo. 205, 215(4), 165 SW. (2d) 390, 395(6); Sing v. St. L.-S. F. Ry. Co., 30 SW. (2d) 37, 41(6). And this is true notwithstanding there was much more testimony that the locomotive did whistle well before it reached the crossing. In these circumstances there was no error in submitting the case to the jury under respondent's instruction No. 1 on both theories—failure to warn and failure to slacken speed.

██ The case is close on the facts, but in our opinion it was sufficient to go to the jury. In reversing and remanding the clause, 240 SW. (2d) l. c. 238 (1), the Court of Appeals opinion held that on a retrial the evidence on primary negligence should be omitted because of its effect on the judgment of the jury as regards the humanitarian side of the case. Since we are affirming the judgment it is unnecessary to comment on this ruling other than to say we know of no way in which the plaintiff could be deprived of the right to assert her cause of action for primary negligence, if she had one, merely because she was also asserting liability under the humanitarian doctrine. The judgment is affirmed.

*Leedy* and *Tipton, JJ.,* concur. *Dalton, J.,* concurs in result in separate concurring opinion filed; *Hyde, Hollingsworth* and *Conkling, JJ.,* concur in result and in separate concurring opinion of *Dalton, J.*

██ DALTON, J.—I concur in the result reached in the principal opinion. While I think instruction 1 has the same defects as the instruction considered in the case of Harrington v. Thompson, 243 S. W. (2d) 519 mentioned in the principal opinion, and that it is subject to the same criticism, yet I think that any ██ error in the form of the instruction was not prejudicial in this case. I think that plaintiff only made out a case for the jury on humanitarian negligence in failing to slacken the speed of the train. This issue of negligence was submitted in the *conjunctive* with humanitarian negligence in failing to warn. This additional assignment of negligence was, I believe, not supported by evidence, there being insufficient evidence to show that, after deceased was apparently oblivious and was in imminent peril, a warning could have been given and the collision avoided. In such situation, and considering all of the instructions which were given to the jury, I do not believe the jury could have been mislead by instruction 1 to the prejudice of appellant.