[1] This is a suit by a widow for the statutory penalty against defendant railroad because of the death of her husband, Floyd W. Harmon, as a result of a collision between deceased's truck and defendant's train. Submission was on the humanitarian theory. There was a verdict for plaintiff for $5000. Defendant appeals. The sole question presented is that of the sufficiency of the evidence to make a submissible case.
[2] Deceased's deposition had been taken in a suit filed by him, and it was read in evidence. He testified to the effect that: The collision occurred in Billings, Missouri, at a point where Highway 14 intersects defendant's main line track. The highway runs north-south, and the railroad line east-west. It was a clear, sunshiny day, and the roadway was dry. Deceased was operating a tractor-trailer, proceeding southward. The overall length of the outfit was 35 feet. Its gross loaded weight was 39 tons. The tractor had six speeds forward and one in reverse. The brakes were in good condition. The tractor was in low gear but the axle was in second gear. He observed the railroad crossing sign from a point 150 feet north, where he stopped at a filling station. The road was steadily upgrade from this point to the main line crossing, rising about 10 feet. Deceased was a former railroad switchman of many years *Page 103 
experience, and he was an experienced truck operator. He knew that trains at high speed might be passing at any moment, from either direction, on the main line. There was a passing track north of the main line, the south rail of which was about 9 feet, 6 inches north of the north rail of the main line. When he was 75 feet north of it deceased observed the passing track and, beyond it, the main line. His speed, from the time he first saw the approaching train, which was when his front wheels were at the north rail of the passing track, was 8, not over 10 miles per hour; it wouldn't travel any faster in that gear. He "let up" on the gas, to decide whether to go on or to stop, and the speed immediately "fell off" 2 miles per hour. He shifted the axle to low and tried to increase speed but, instead, the speed continued to decrease until the moment of the collision, at which time it was 3 miles per hour, barely moving. The engine struck the trailer at a point from 10 to 14 feet back of its front. When he first saw the train it was up at the station. Its speed was better than 30 miles per hour, and it was not decreased until the collision occurred. He stated that when the collision occurred the train line was broken and all of the brakes went on.
[3] There was a shed a few feet west of the crossing, north of the passing track, which blocked the view of a train from the west until one reached a point some 10 feet north of the passing track. It was 431 feet west, from the west edge of the crossing, to the center line of a water tower located on the south side of the main line. It was 480 feet west, from the west edge of the crossing, to the east edge of the Washington Street crossing. It was about 600 feet west, from the west edge of the crossing to the station house, located to the south of the main line. The train was a troop train, consisting of 2 cook cars, 12 pullmans, and 22 freight cars, and was 2000 feet in length. It was traveling east, and was pulled by a 4500 engine, the boiler of which was at least 60 feet in length. It was upgrade from west of the station to a point between the station and the place of collision. From there eastward the track was downgrade.
[4] Plaintiff introduced evidence to the effect that the speed of the train was 36 miles per hour. Deceased stated that its speed was more than 30 miles. Members of the train crew stated the speed to be 35 miles per hour. Therefore the evidence indicates the speed to have been at least 35 miles per hour.
[5] Plaintiff's witness Wilson, a retired engineer formerly employed by defendant, testified to the effect that a train of this type, traveling at a speed of 35 miles per hour, under conditions there existing, could have been brought to a stop at the time and place where, the collision occurred within from 450 to 500 feet, after an emergency arose; that he had made an emergency stop with a train, for this same crossing, and was basing his judgment on that experience as well as on his general knowledge and experience as an engineer; that the speed could be reduced 5 miles per hour in the first 100 feet, an additional 8 miles in the second 100, an additional 10 in the third 100 and would stop in another 125 or 150 feet.
[6] Plaintiff also offered the testimony of Mr. Stanley, a retired Rock Island engineer. He gave it as his opinion that a train of the character and consist of the one here involved, traveling at 35 miles per hour, under the conditions obtaining at the time and place of the collision, could have been brought to a stop within a distance of 525 feet after the emergency arose, including the time for reaction of the fireman and engineer and for the brakes to set. He said the speed could be retarded 2 miles per hour in the first 100 feet; an additional 4 miles in the second 100 feet; an additional 6 miles during the next 100 feet.
[7] Plaintiff's witness, Ebert, testified to the effect that he was clerking in a grocery store at the time the collision occurred; that the store was located about 40 feet south and east of the depot, facing Washington Street; that he saw the collision through the glass front of the store; that when he first saw the engine its front end was a little past the water tower; that a second later he looked toward the crossing and the tractor was practically over the track; that the speed of the train was 30 *Page 104 
to 35 miles per hour. On cross-examination he stated that when he first saw the engine its front end was a little east of the water tower; that a second later he looked at the crossing and the front of the tractor was coming up on the north rail of the main line, practically on the track. He did not change this latter version on redirect examination.
[8] Testifying for defendant, the fireman stated that he was on the left side of the cab; that he first saw the tractor when it was about 25 feet north of the main line, proceeding at about 10 miles per hour; that there was plenty of room for it to have stopped before reaching the crossing; that the engine cab was then about 200 feet west of the crossing; that he did not see the trailer until later; that it continued southward and he thought the driver might not stop so he sounded a whistle to attract the engineer's attention, and shouted "big hole her"; that the front of the engine was then about 150 feet west of the crossing and the front of the tractor was 15 or 20 feet north; that the front of the engine came to a stop about 1000 feet east of the crossing.
[9] Defendant's engineer testified to the effect that he was on the right side of the cab; that the cab was about midway between Washington Street and the point of collision when the fireman sounded the whistle; that the front of the engine was about 100 feet west of the crossing when he made an emergency application of the brakes; that thereafter he shut off the throttle and put down the sand; that the train's speed was about 35 miles per hour and there was no appreciable slackening prior to the collision; that he could not see the tractor-trailer as it approached from the north; that the front of the engine came to a stop about 1000 feet east of the point of collision. He stated that it would take 4 or 5 seconds from the time the brake is applied until there would be an appreciable effect on the train's speed, plus the reaction time of the fireman and engineer.
[10] In a humanitarian case it is required that there be substantial evidence which tends to prove every element of plaintiff's case; otherwise plaintiff fails to make a submissible case. Johnson v. Kansas City Public Service Co., 358 Mo. 253,214 S.W.2d 5, loc. cit. 10.
[11] The question here, briefly stated, is: Was there substantial evidence tending to prove that defendant's fireman and engineer could have seen deceased in a position of imminent peril in sufficient time thereafter, by the exercise of ordinary care, to have slackened the speed of the train sufficiently to have avoided the collision? Yeaman v. Storms, 358 Mo. 774, 217 S.W.2d 495, loc. cit. 498.
[12] According to plaintiff's evidence the fireman could have seen the truck approaching the track at a speed of about 10 miles per hour, when its front end was at a point some 25 feet north of the track. He could have seen the tractor begin to lose speed when the front wheels came onto the north rail of the passing track, and continue to lose speed as it proceeded. Deceased saw the train when the front of his truck was about 14 feet from the north rail of the main line track, and continued thereafter to observe it. He could have stopped within 10 feet. He was not oblivious of the approach of the train, or of possible danger. Under these facts no duty to stop arose until the fireman could have seen that deceased was not going to stop before entering the pathway of the train. Johnson v. Missouri Public Service Company, supra, 214 S.W.2d loc. cit. 10. He traveled from the north rail of the passing track until the collision occurred, a distance of about 40 feet, at an average speed of about 8 feet per second. That, in effect, is deceased's testimony, and it is not contradicted by any other evidence. The train, necessarily, traveled the same period of time, after deceased first saw it and until the collision occurred; but it traveled at the rate of 52 feet per second. Therefore, the front of the engine must have been not more than 260 feet west of the point of collision when the front end of the tractor was 14 feet north of the main line track.
[13] True, deceased stated that the engine was then at the station, some 600 feet west of the crossing; but if that were true, traveling at 35 miles per hour, as the evidence indicated, it would have taken the front end *Page 105 
of the engine more than twice as long to reach the crossing as it took the front of deceased's truck to reach a point some 20 to 25 feet south of the crossing, the position that it occupied when the collision occurred. This is true because the train's speed according to all of the testimony, was not reduced until after, or at the time of the collision.
[14] Furthermore, the question is not whether defendant's agents could have a voided striking the trailer at the point it did strike but, rather, whether a collision could have been avoided. In order for the trailer to have escaped the collision it must have traveled an additional 14 feet, or thereabouts, at a speed of 3 miles per hour. This would have taken an additional, approximately, 3 seconds. There is no evidence whatever which tends to prove that the speed of the train could have been sufficiently slackened, after the front of the engine was 260 feet from the crossing, so as to have delayed its arrival by as much as 3 seconds. At the most, accepting as true the evidence most favorable to plaintiff in respect to slackening speed, the arrival of the train could have been delayed but one second, not 3; and there was no evidence to the effect that the train could have been brought to a stop within a distance of 260 feet.
[15] We have assumed a duty on the part of the fireman to have acted when the front of the truck was at the north rail of the passing track, some 14 feet from the north rail of the main line track, and 12 1/2 feet north of the "overhang" of the train; but we have assumed that the fireman's duty arose at that point only for the purpose of demonstrating the complete failure of plaintiff's evidence. We do not hold that the deceased was, at that time, in peril. Deceased's own testimony conclusively proved that he was not.
[16] Plaintiff's entire case was bottomed on the theory that the train was at the station, some 600 feet west of the crossing, when the front of the truck reached the north rail of the passing track, and that deceased came into a position of imminent peril at a time when the front of defendant's engine was at about the water tower, some 431 feet west of the crossing, or at the Washington Street crossing, some 50 feet further west. The only direct testimony to the effect that the engine was at the station when the front of the truck was at the north rail of the passing track came from deceased; but he also definitely gave the location and speed of his truck at that time. He could not have been correct as to the location of the train if he was correct as to his own location and speed. He was quite definite about his own speed and location, said the truck in low gear would not travel upgrade at more than 10 miles per hour, and that it "fell off" 2 miles when he let up on the gas, that it began sputtering, and continually lost speed from that time forward.
[17] Plaintiff's only other testimony as to location of the tractor and trailer, and of the train, at any given time, came from Mr. Ebert. He first saw the engine "a little east" of the water tower and a second thereafter, he saw the front of the truck on the north rail of the track. How much east "a little east" is we have no way of knowing, nor could the jury have known, especially considering the angle from which Ebert was viewing the scene. He did not see the tractor at any place where it could have stopped before coming into the path of the train; nor did he see the train at any definite place where it might have been stopped, or the speed slackened, so as to have prevented a collision. Such evidence falls short of proof that defendant's agents saw, or could have seen, deceased in a position of imminent peril in time thereafter for them to have slackened speed sufficiently to have avoided a collision with the trailer. Especially is this true in view of all of the evidence as to deceased's location and speed, and of all of the evidence as to speed of the train, from and after the tractor reached the north rail of the passing track, on up until the collision occurred. The definite location and speed of the truck, and the undisputed speed of the train, constitute an insurmountable barrier to plaintiff's right of recovery, under her own theory and evidence.
[18] The judgment should be reversed. *Page 106 
[19] BOUR, C., concurs.