FLORENCE HILLHOUSE, ADMINISTRATRIX OF ESTATE OF ROLLIE EVERETT DAVIDSON, DECEASED, RESPONDENT, v. GUY A. THOMPSON, TRUSTEE OF THE MISSOURI PACIFIC RAILROAD COMPANY, A CORPORATION, APPELLANT.—240 SW (2) 224.

Springfield Court of Appeals.   Opinion filed April 24, 1951.

*Thomas J. Cole,* St. Louis, and *E. A. Barbour, Jr.,* Springfield, for Appellant.

862

*Charles E. Ginn*, Aurora, and *Jo B. Gardner*, Monett, for respondent.

McDOWELL, J.—This is an action for damages for wrongful death brought by the administratrix of the estate of Rollie Everett Davidson, who was killed by defendant's train on a public crossing in Lawrence County, Missouri. The cause was transferred to Christian

County, on change of venue, where it was tried by a jury. The only issue submitted was negligence under the humanitarian doctrine. Plaintiff recovered a verdict for $6,000.00 and, from the judgment entered thereon, defendant appealed.

The petition was in two counts. The first count was against M. F. McNabb, the engineer, and defendant-railroad company. The second count was against the railroad company only.

The first count was abandoned and cause submitted to the jury on the second count.

The second count of the petition was based on both primary negligence and humanitarian negligence but the cause was submitted only on humanitarian negligence for failure to sound a warning of the train's approach and slacken the speed of said train.

Defendant's first amended answer denies the negligence of its employee and affirmatively pleads that the deceased's negligent acts contributed to or were the sole cause of the collision, resulting in his death.

The evidence shows Rollie Everett Davidson was a resident of Luray, Kansas; that he was never married; that Minnie Davidson, his mother, was his sole surviving heir at law. It is admitted that Mrs. Florence Hillhouse was duly appointed administratrix of the estate of deceased.

There is no dispute that on or about 7:30 A. M., August 26, 1949, said Davidson was killed in a collision between defendant's train and a truck which Davidson was driving at a grade crossing on public highway known as High Street road, a mile and a fourth northwest of the city of Aurora.

Durard Prater testified for plaintiff that on the morning of August 26, 1949, he, together with Mrs. Frankie Thurman and Maxine Murphy, all residents of Aurora, were going to work at Mt. Vernon, in a 1939 Oldsmobile coach driven by Prater. He stated they were traveling west on what is known as High Street road, an extension of High Street of the city of Aurora, which road runs west across defendant's tracks to Missouri State Highway No. 39; that this road is a much traveled public highway. He stated that High Street road is black-topped and, as it approaches the defendant's line of railroad, there is a sharp rise where it goes over defendant's tracks; that the tracks are elevated about five or six feet above the bed of High Street road and the road narrows down as it goes over the tracks so that it accommodates, normally, only one line of traffic; that defendant's railroad, at the point of this crossing, runs northwestwardly and southeastwardly, and Missouri Highway No. 39 runs in the same direction, parallel to said tracks, a distance of 75 or 100 feet west of the railroad; that northwest of this crossing, defendant's railroad is in a fairly deep cut, but

emerges from the cut and is on a five or six foot fill where High Street crosses the tracks.

The witness stated that as he approached the crossing he was driving about 15 miles per hour and started up grade; that he did not hear the train whistle or the bell ring and did not see the train until he got right on the tracks; he stated in about five feet from the tracks; that he started to stop but thought he was too close and went on over the tracks. He testified that the train was 175 to 200 feet from him at that time. He stated that after he crossed defendant's tracks he met deceased in a pick-up roadster car. He gave this testimony:

"Q. Where were you with reference to the tracks, when you saw another vehicle approaching? A. I was about twenty feet from the tracks.

"Q. Where was that other vehicle? A. I was just about meeting it.

"Q. Where were your right wheels with reference to the black top? A. They were off the black top.

"Q. Could you tell the jury your best estimate of the speed of the other car? A. About 12 or 15 miles.

"Q. What kind of a car was it? A. It was a Model 'A' roadster with a panel on the back.

"Q. Did you ever hear the train whistle? A. Yes, after I got across the track."

The witness stated that the whistle was very low. He stated he did not know the tragedy had occurred until he got to work at Mt. Vernon; that he looked back when he got to Highway No. 39 and thought that the truck had gotten across. This witness testified that he saw a car parked across Highway 39, facing in an easterly direction, which was a 1940 or '41 Chevrolet.

Mrs. Frankie Thurman, who was riding in the back seat of the car driven by Prater, testified that the Prater car met the truck in which deceased was driving about halfway between defendant's tracks and Highway No. 39; that she heard a faint whistle as the cars met. She stated she thought defendant's train was about 250 or 300 feet down the track and that they were safe in crossing.

Mrs. Maxine Murphy testified she was in the Prater car; that the car went upgrade for the crossing; that after the crossing they passed another car not far from it but she could not say how far; that immediately after they crossed the tracks she heard the whistle which was not too loud.

M. F. McNabb testified, for plaintiff, he was the engineer on defendant's train at the time; that he had been in the service of the railroad for 45 years; that he had taken charge of this train on the day in question at Carthage, about 39 miles away; that the train consisted of the engine and five cars: a baggage and mail car,

a combination baggage and day coach and a coach and pullman, together with the locomotive and tender; that the whistle, bell and brakes were all in good condition and that the fuel used was oil. He stated he tested the equipment before he left Carthage and it was working properly; that the grade is straight for about a quarter mile before he reached the public highway in question and that Highway No. 39 parallels the railroad track. He stated that the highway crossing the tracks was a much traveled public highway; that the train, that day, was about five minutes late and they were due at Opal at 7:02 A. M., corrected 7:28; that the visibility was good, the track was dry; that as he approached the crossing in question he could see the black-top road which turns off from Highway No. 39 and leads over the crossing; that there was nothing to interfere with his view from seeing the deceased's car; that, as he approached the crossing, he was traveling 50 miles per hour; that he had reduced his speed at the top of the hill where the 35 mile board was; that he had made his service application of about 12 pounds. He gave this testimony:

"Q. Did you see this Model 'A' truck, in which Mr. Davidson was driving as it turned off Highway No. 39? A. Yes, after leaving the highway. I saw it between the highway and the crossing.

"Q. How far back from the crossing was your train at that time? A. Well, I don't know exactly, it happened pretty quick and it is hard to estimate how far back I was, because there was a black automobile that went over and I immediately put on the brakes, and this fellow in the black automobile—I didn't think he was going to make it.

"Q. What kind of a car was it? A. I don't know. This other car I thought had stopped, that I struck—and this fellow came on and shot right over, and I had the brakes in emergency.

"Q. You put them in emergency about how far from the crossing? A. That is hard to say—probably two or three hundred feet. I was travelling about forty-five miles or fifty miles an hour, and it was getting close to this car but he got over all right."

The witness testified that he put on the sander at the time he put on the brakes in emergency and left it on until the train stopped; that he saw sand on the rails on his side of the track. He gave this testimony:

"Q. How far did that train travel past the crossing? A. About fifteen hundred feet."

The witness testified that he did not believe that the deceased's car was more than ten feet from the crossing when it looked like he speeded up to go over the track; that he had the emergency on when the train hit the truck which had reduced the speed some, he thought 45 to 50 miles per hour.

The witness testified he blew the whistle continuously from the time he blew for the station until he hit the truck of deceased. He stated he made the service application of the brakes when he started in blowing the crossing whistle; that he was sitting on the right hand side of the engine. He gave this testimony:

"Q. Where was the truck with relation to Highway No. 39 and the tracks when you first saw it? A. Well, he must have been around 30 feet I imagine from the track—more than half way.

"Q. Could you say the rate of speed he was travelling? A. I thought he was stopped."

He stated that he didn't have any doubt that the deceased would stop and he gave as his reason the slow speed in which he was traveling. He gave this testimony:

"Q. And going slow or stopped—what did you do then—you didn't keep your eyes on him? A. No, there was an automobile that came over in front of him—I didn't pay any more attention to him."

The witness testified the deceased was not in a dangerous position at the time. He stated he did not see the other car until it was on the tracks and that is when he first put his engine in emergency; that it was not 200 feet back when he put his engine in emergency. He gave this testimony:

"Q. How far was it? A. It would not have been over one hundred feet.

"Q. When you first saw him approaching the track, is that the first time you thought he was in danger? A. No, not until he speeded up."

The witness testified that he was already in emergency when he discovered the deceased was in danger and there was nothing he could have done in the way of warning the deceased to prevent the collision. He stated that deceased was about ten feet from the track when he first realized he was in danger; that the bell was ringing and had been from a quarter of mile back from the crossing. He stated that he made a good stop considering the brakes and the declining grade; that he used the sander on the engine.

The witness admitted, in a deposition, he had stated that the deceased's car came on at a steady rate of speed; that he was going slow, probably not over 10 or 15 miles per hour; that he had testified the engine was 25 or 30 feet from the crossing when deceased's car was 10 feet from the west grade. He gave this testimony:

"Q. Mr. McNabb, did you see Mr. Davidson in that truck? A. Well, I hardly believe that I did.

"Q. Did you see the side of his face? A. I couldn't say if I did or not."

He admitted that he stated in his deposition that he could see the deceased plain and that if the deceased looked toward him he

did not see him do so. He stated he did not see the deceased do anything.

Frank Pfitzner testified that he was a farmer, at the time living two miles and a half northwest of Aurora; that on the morning of the tragedy he was driving east on High Street road in his pick-up, a 1941 Ford; that immediately prior to the collision he stopped on the west side of Highway No. 39 at a stop sign; that he noticed a car coming down Highway No. 39, going into Aurora; that instead of going into Aurora, he turned and went east over the railroad track; that the car was a 1929 Model "A" with a little bed on the back of it. He stated the bed was 10 or 12 feet long; that the over-all length of the truck was about 15 feet. He stated that from where his car stopped it was 168 feet to the west rail of the crossing; that the railroad track was about 7 feet high where the public road crosses it; he measured the black-top road and found it to be 10 feet in width with a two foot shoulder on each side, making fourteen feet from side to side; that he estimated the speed of the truck at not over 15 miles per hour as it approached the railroad. He stated he tried to stop the truck by honking his horn, but that the truck continued a steady speed up that grade. He stated that another car, coming from the east, crossed the tracks and passed the deceased's truck 10 or 15 feet from the track on the west side. He stated that the truck was in a one-way traffic on the black-top and when he met the other car each of the cars pulled over. He stated that he never heard the train; that he heard the whistle about 135 feet from the crossing for the first time and did not hear the bell ringing; that his car was idling and the window on his side was down. He gave this answer: "Yes, it hit about three feet of the little bed." He stated that he measured from the accident to where the train stopped and it was 591 feet from the crossing to the rear of the train. He stated it was 471 feet from the crossing before he found any sand.

The deposition of M. F. McNabb shows he stated when the car from the left crossed the tracks his engine was about 20 or 30 feet from the crossing; that probably he was 12 or 15 feet from the crossing when he applied his brakes in emergency and that he applied the emergency for the black car and that the car must have passed the deceased's truck pretty close to the tracks for just at that instant this truck came on the track. He stated he was probably 50 feet from the crossing when he first saw the car from the east come over the track and that he was at that time running about 50 miles an hour; that he thought the other truck had stopped for he was moving awfully slow but when the car got over the truck came on and he applied the emergency. He stated in this deposition that he pushed the sander on when he went into emergency and that was about 10 feet back or maybe 15 feet. He also stated in this deposition that he never made

an emergency application of the brakes prior to the point of impact but he stated there must be some mistake or that he didn't understand the question. Then he stated further, in this same deposition, that he applied the emergency application probably 12 or 15 feet from the crossing and that he had the brakes in emergency before he hit the car.

A. F. Smallenberger testified for plaintiff that he was 77 years old, lived in St. Louis,, and was a retired locomotive engineer; that he worked with the Missouri Pacific from 1905 until 1946; that he operated all types of locomotives as an engineer for the defendant-railroad; that he examined the scene of this accident between one half mile and a mile northwest of Aurora; that he walked three-quarters of a mile in each direction on the track; that there were 30 poles to the mile but the poles were not evenly placed; that the whistling post is located 19 poles north of the scene of the accident. He stated these poles were about 75 feet apart. He testified about the speed restrictions north of the scene of accident. He stated there was a sign less than a pole's length south from the whistling post, limiting speed to 35 miles per hour and that the front end of the engine should be reduced to that speed. He testified there was a sign near the Frisco Railroad tracks limiting speed to 20 miles per hour. In fact, he gives a great deal of testimony relative to railroad signs and speeds north of the place of accident. He then testified as to the effect of placing sand on the wheels to reduce speed. He testified that the application of sand, when the brakes were in service application, would assist in bringing the train to a quicker stop. He answered hypothetical questions as to what effect the application of 12 pounds would have on the stopping of the train and what the speed of the train would have been at the crossing where the accident happened. To this testimony there was an objection on the part of defendant. He testified that in an emergency application the train could be stopped in twice the length thereof or, in this case, 1200 feet. This testimony was objected to because the emergency did not exist until the train was 100 feet from the crossing. The witness testified that the reaction time would be two to two and one-half seconds in making an emergency application and that if applied 150 feet from the crossing, it could probably have checked the speed five miles per hour. Then this question was asked:

"Q. * * * we assume the emergency application had been made ten or fifteen feet from the crossing instead of one hundred feet and that the combined service application and the emergency application reduced the speed of that train to fifty miles per hour as it went over the crossing—can you tell the jury what the speed of that train would have been at ten to fifteen feet instead of one hundred feet?" (This question was objected to as immaterial for there was no duty on the engineer to go into emergency until he saw that deceased was in immediate peril.)

"Q. Assuming a like train was travelling fifty nine miles per hour and somewhere north of the crossing a service application had been made and an emergency application had been made twelve to fifteen feet from the crossing—if that emergency application had not been made one hundred feet from the crossing how much slower would that train have gone over the crossing by adding the emergency application at eighty five feet earlier? A. He would have arrived about two seconds later."

Then the witness stated the train's speed would have been about 35 miles per hour. The same hypothetical question was presented to the witness as to the speed if the application had been made 75 feet from the crossing and the speed was 50 miles per hour and the witness answered 35 miles per hour. He stated under that condition the train would have reached the crossing a second and half later. He testified that if the train traveled 1500 feet from the place of accident before stopping, the brakes would have been applied south of the crossing.

The testimony on the part of the defendant, by a number of witnesses, shows that the distance the deceased traveled, after turning into High Street road from Missouri Highway No. 39 to reach defendant's tracks, was 125 feet; that there is a grade on the railroad of some six or seven feet; that this stretch of the highway from Highway No. 39 to the railroad has a ten foot wide black-top and shoulder on each side of two feet. There is no question but what the High Street public road intersects the defendant's tracks at an angle of about 45 degrees. There is no question but that the deceased could have seen defendant's train for at least a distance of 220 feet from the crossing when he was within a distance of 100 feet from such crossing had he looked. There was an elm tree north of the intersection of Highway No. 39 and High Street road but the exhibits clearly show that had the deceased looked when he was 75 feet before reaching the crossing he could have observed the train 300 feet back from the crossing and that when he was within 50 feet of the crossing he had a clear vision of the defendant's railroad for a distance of 1500 feet.

Defendant's evidence also showed by numerous witnesses its train was sounding its whistle continuously as it approached this crossing and that the bell was ringing and its testimony also showed by witnesses who were on the train that the train was placed in emergency before the accident.

In this opinion we will refer to the respondent as plaintiff and to the appellant as defendant.

The defendant first complains, under its points and authorities, that the trial court erred in refusing to sustain its motion for a

directed verdict at the close of plaintiff's evidence and at the close of all of the evidence.

That the court erred under the law and evidence in submitting the case to the jury under the theory of humanitarian negligence.

Under this assignment of error we will consider the evidence most favorable to plaintiff and will disregard the defendant's evidence unless it aids the plaintiff's case. If there is an evidentiary basis for the verdict of the jury, this assignment of error must be ruled against defendant. In other words, if there is substantial evidence to support the verdict then the cause should have been submitted to the jury and the finding of the jury is conclusive on this court. Johnson v. Thompson (Mo. App.) 236 S. W. 2d 1; Cable v. Chicago, B. & Q. R. Co. (Mo. Sup.) 236 S. W. 2d 328; Kirkpatrick v. Wabash R. Co. (Mo. Sup.) 212 S. W. 2d 764; Womack v. Missouri Pacific Railway Co., 337 Mo. 1160, 88 S. W. 2d 368; Bowman v. Standard Oil Co., 350 Mo. 958, 169 S. W. 2d 384; Bean v. St. Louis Public Service Co. (Mo. App.) 233 S. W. 2d 782, 786.

In Knorp v. Thompson, 352 Mo. 44, 175 S. W. 2d 889, 899, the court states the law as to the facts necessary to make a case under the humanitarian doctrine as follows:

"The constitutive facts of a humanitarian case are: " '(1) Plaintiff was in a position of peril; (2) defendant had notice thereof (if it was the duty of defendant to have been on the lookout, constructive notice suffices); (3) defendant after receiving such notice had the present ability with the means at hand, to have averted the impending injury * * *; and (4) by reason thereof plaintiff was injured.' Evidence tending to prove these facts makes a prima facie case for plaintiff. In some instances obliviousness of danger on the part of the plaintiff is necessary to make the situation in which he is placed one of peril. In such cases it is of course incumbent upon the plaintiff to make proof of the facts and circumstances tending to show obliviousness, not only for the purpose of establishing that he was in a position of peril, but to bring home to defendant a knowledge of his peril. In these cases, however, obliviousness is but a subsidiary or evidentiary fact, the perilous situation of plaintiff and defendant's knowledge of it are the ultimate, issuable facts.' Banks v. Morris & Company, 302 Mo. 254, 257 S. W. 482, 484.

"Defendant had the duty to maintain a lookout for persons approaching or upon the intersections of public highways and defendant's tracks. Womack v. Missouri Pac. R. Co., 337 Mo. 1160, 88 S. W. 2d 368; * * *

" '* * * The defendant is entitled to assume that the plaintiff is paying or will pay reasonable attention to his surroundings; until he has reason to suspect the contrary, he has no reason to believe

that the plaintiff is in any danger. Therefore, the defendant is liable only if he realizes or has reason to realize that the plaintiff is inattentive and consequently in peril. Thus, if an engineer of a train approaching a level highway crossing sees a traveler approaching the track on foot or in a vehicle, he is not required to take any steps either to warn the traveler by an additional blast of his whistle or to bring the train under special control, since he is entitled to assume that the traveler has discovered or will discover the oncoming train and will stop before reaching the crossing. However, * * * if there is anything in the demeanor or conduct of the plaintiff which to a reasonable man in the defendant's position would indicate that the plaintiff is inattentive and, therefore, will or may not discover the approach of the train, the engineer must take such steps as a reasonable man would think necessary under the circumstances. * * *' * * *

"Defendant's duty to use care to avert injury to another under the humanitarian doctrine arises only 'on (defendant's) discovery of peril, or on negligence in discovering it when there is a duty to keep an outlook and make discovery of the peril.' State ex rel. Fleming v. Bland, 322 Mo. 565, 15 S. W. 2d 798, 800. In the latter situation, under the humanitarian doctrine, a defendant 'To be free from negligence * * * must act on reasonable appearances and at a time when action would be effective.' Allen v. Kessler, Mo. Sup. 64 S. W. 2d 630, 633. * * *"

In the case at bar it is plaintiff's contention that the defendant, by the exercise of ordinary care, discovered or should have discovered that the deceased was in imminent peril and oblivious to the approach of defendant's train at a time after which the defendant had the present ability and the means at hand, to have averted the impending injury by sounding a warning of the train's approach and by slackening the speed of the train.

The law was stated in Cable v. Chicago, B. & Q. R. Co., supra, page 332 thereof:

"* * * The fact that plaintiff drove upon the track in front of the approaching train was some evidence that he was in fact oblivious. It is hardly reasonable to believe that the truck would have been slowly driven into the path of the train, under the circumstances shown, if plaintiff had not been oblivious to the train's approach. Womack v. Missouri Pac. R. Co., 337 Mo. 1160, 88 S. W. 2d 368, 371. Obliviousness is an essential element of a humanitarian negligence case based upon a failure to warn, since if plaintiff knew of the train's approach there would have been no duty to warn him and a warning would serve no useful purpose. Pentecost v. St. Louis Merchants' Bridge Terminal R. Co., 334 Mo. 572, 66 S. W. 2d 533, 535."

872

In the case at bar the evidence is undisputed that the deceased drove his truck a distance of 125 feet from the intersection of Missouri Highway No. 39, at a speed of 12 to 15 miles per hour, to and upon defendant's track, up an incline of six or seven feet and at no time slowed down or checked his speed. This, in itself, was sufficient evidence for the jury to have found that the deceased was oblivious to the approach of defendant's train. But there was further evidence upon which the jury might base its findings that deceased was oblivious to the approach of the train. The evidence is undisputed that the road on which deceased was traveling to cross defendant's tracks was a narrow road and where it crossed the track it was practically a one-way traffic road; that 20 or 25 feet before deceased reached the track he met another automobile, which caused deceased to have to give his undivided attention to the passing of this car on a narrow road, and which fact might have prevented him from looking for and seeing defendant's train as it approached. The testimony further, on the part of defendant's engineer, is to the fact that he saw deceased in the car as he approached defendant's track, possibly about 30 feet from the track; that he did not see deceased look toward the train and stated that deceased didn't do anything.

Certainly, under the decision of the Supreme Court in Cable v. Chicago, B. & Q. R. Co., supra, there was sufficient evidence that the jury might find that deceased was oblivious to the approach of the train and to the danger of the collision which took his life.

However, the fact that deceased was oblivious to the approach of defendant's train, is not enough to make a case of liability against defendant, where, as in this case, such liability is based upon the duty to warn for the purpose of preventing the deceased from going immediately into a position of peril, unless it further appeared that the deceased's obliviousness was sufficiently apparent as to impart notice to the engineer if he had exercised ordinary care in keeping a lookout.

In Womack v. Missouri Pac. R. Co., supra, page 371, the court states:

"* * * The evidence was also sufficient to show that deceased was actually oblivious to the approach of the train, which is an essential element of a humanitarian negligence case of failure to warn * * * and because it was hardly reasonable to believe that the car would have been driven onto the track, under the circumstances, if she had not been oblivious. But these things were not enough to make a case of liability against defendant, in a case like this based upon the duty to warn for the purpose of preventing a person from going on immediately into a position of peril, unless it further appeared that deceased's obliviousness was sufficiently apparent that such obliviousness could have been known to the engineer if he had exercised ordinary care in keeping a lookout.

"Explaining this proposition, in the Restatement of the Law of Torts, Sec. 480, it is said: 'It is not enough that the defendant should see the plaintiff in a position which would be dangerous were the plaintiff not aware of what is going on. The defendant must also realize or have reason to realize that the plaintiff is inattentive and, therefore, is in peril. The defendant is entitled to assume that the plaintiff is paying or will pay reasonable attention to his surroundings; until he has reason to suspect the contrary, he has no reason to believe that the plaintiff is in any danger. Therefore, the defendant is liable only if he realizes or has reason to realize that the plaintiff is inattentive and consequently in peril. Thus, if an engineer of a train, approaching a level highway crossing sees a traveler approaching the track on foot or in a vehicle, he is not required to take any steps either to warn the traveler by an additional blast of his whistle or to bring the train under special control, since he is entitled to assume that the traveler has discovered or will discover the oncoming train and will stop before reaching the crossing. However, it is not necessary that the circumstances be such as to convince the defendant that the plaintiff is inattentive and, therefore, in danger. It is enough that the circumstances are such as to indicate a reasonable chance that this is the case. Even such a chance that the plaintiff will not discover his peril is enough to require the defendant to make a reasonable effort to avoid injuring him. Therefore, if there is anything in the demeanor or conduct of the plaintiff which to a reasonable man in the defendant's position would indicate that the plaintiff is inattentive and, therefore, will or may not discover the approach of the train, the engineer must take such steps as a reasonable man would think necessary under the circumstances. If a train is at some little distance, the blowing of a whistle would ordinarily be enough, until it is apparent that the whistle is either unheard or disregarded.'

"In short, in such a situation, a defendant 'to be free from negligence * * * must act on reasonable appearances and at a time when action would be effective.' Allen v. Kessler (Mo. Sup.) 64 S. W. (2d) 630, 633. See, also, Martin v. Fehse, 331 Mo. 861, 55 S. W. (2d) 440; Hart v. Weber (Mo. Sup.) 53 S. W. (2d) 914; Alexander v. St. Louis-San Francisco R. Co., 327 Mo. 1012, 38 S. W. (2d) 1023; Herrell v. St. Louis-San Francisco R. Co., 322 Mo. 551, 18 S. W. (2d) 481."

We think the law is clearly stated in the above case. There can be no doubt that even though the deceased was oblivious to the approach of the train, which obliviousness brought him into a position of imminent peril, yet the defendant is not liable because of that fact alone. The liability of defendant arises when it discovers by the exercise of ordinary care that deceased is in a position of imminent peril and until such is the case, there is no duty under

874

the law placed upon defendant either to give a warning by sounding of its whistle or the ringing of a bell or to slacken the speed of its train.

Of course it is no defense that the deceased was negligent, because, in this case, there can be no doubt that deceased was negligent as a matter of law and that his negligence directly contributed to his death. Yet if defendant, which, in this case, had a duty to keep a lookout for automobiles approaching its track on a public highway, by the exercise of reasonable care, saw or could have seen that deceased was approaching its track oblivious to the impending danger and in a position of imminent peril in time to have warned the deceased, either by sounding a whistle or by ringing a bell or by slackening the speed of the train, and that such warning or slackening of speed would have averted the injury, then defendant is liable.

In Cable v. Chicago, B. & Q. R. Co., supra, l. c. 333, the court states the law:

"* * * Evidence of obliviousness, however, extended the danger zone, and imminent peril was not limited to unavoidable danger. * * *"

In Kirkpatrick v. Wabash R. Co., supra, page 768, the court states the following law:

" 'Position of peril' or 'imminent peril' as applied to the humanitarian doctrine does not mean a bare possibility of danger. It means a certain peril, a place where danger is imminently impending. Wallace v. St. Joseph Ry., Light, Heat & Power Co., 336 Mo. 282, 77 S. W. 2d 1011; Branson v. Abernathy Furn. Co., 344 Mo. 1171, 130 S. W. 2d 562, Thomasson v. Henwood, 235 Mo. App. 1211, 146 S. W. 2d 88."

The issue presented to this court is, did defendant's engineer discover the imminent peril of the deceased in time, with the means at hand, to have avoided the injury by sounding a warning to the deceased or by slackening the speed of the train.

We think plaintiff's testimony is undisputed that the defendant did sound a warning in time to have prevented the injury had deceased paid any attention thereto.

The only eyewitness to the tragedy, Frank Pfitzner, testified that the engineer blew the whistle on the train 135 feet from the crossing and plaintiff's three witnesses, who were in the automobile, which met deceased, testified that they heard the whistle just after their car crossed defendant's track. The driver of that car stated that he heard the whistle about the time he met deceased's car 20 or 25 feet from the track and he testified that when he crossed the track, the train was 175 or 200 feet from the crossing. This testimony strongly corroborates that of Frank Pfitzner. All of the witnesses testified they heard the whistle of the train, so there can be no doubt in the minds of this court that as a matter of law, deceased was

warned by the sounding of the whistle in time to have avoided the injury.

Plaintiff's testimony is negative as to whether or not the bell was ringing and as to whether or not the train whistled more than one time. All, except defendant's engineer, McNabb, who stated the whistle was continuously blowing and the bell continuously ringing all the time approaching the crossing, testified they did not hear.

Defendant's testimony positively states the deceased was warned by the sounding of the whistle and the ringing of the bell.

Under this testimony, we hold that reasonable minds could not differ on the question of defendant sounding a warning in time to have avoided the accident, had deceased heeded the warning.

The most serious question is, whether or not the accident could have been averted by defendant, by the application of the brakes after its discovery of the imminent peril of the deceased?

Each case must be decided upon its own facts. In the case at bar the testimony is undisputed that deceased's truck had almost cleared defendant's track. The last three feet of the truck was struck by the train. It is apparent that a very slight slackening speed of the train under these facts would have avoided the collision.

In passing upon whether or not plaintiff made a submissible case, we consider all of plaintiff's testimony as true and such part of defendant's evidence as aids or assists plaintiff's case. We disregard defendant's testimony which tends to deny or destroy plaintiff's case.

Defendant's engineer testified that he first observed the deceased's car between the intersection of High Street with Highway No. 39 and defendant's track about 30 feet from the track; that the deceased's car was traveling slow and he thought it was in no danger. He stated that he had made his service application of the brakes on his train some distance before the crossing, which had reduced its speed from 59 miles per hour to 45 or 50 miles per hour. In his testimony, at the trial, he stated he put the train in emergency when the black car from the east crossed the track and that at that time he was 100 feet from the crossing. He stated he put the brakes in emergency for the black car and not for the car of deceased because he thought deceased's car had stopped or would stop. He testified that he paid no more attention to the actions of deceased's car and was watching the black car, until deceased's car was within about ten feet of the track and speeded up to go across.

The engineer's testimony was impeached by the offering of his former deposition. In this deposition he gave the following testimony:

"Question. What was the position of the front end of the locomotive when the emergency application was made? Where was it from the crossing? Answer. Probably twelve or fifteen feet from the crossing. I had the brakes in emergency before I hit the car. There was a

black automobile coming from the other way onto the track ahead of me, and he was driving very fast, and he went on over, and I was applying my brakes for him. I couldn't say how far I was from the crossing when he went over. As he went over going in the opposite direction, I had seen this little truck on that turnout, and he must have passed him pretty close, because just at that instant this truck came on the track."

The engineer testified that he did not realize the danger of deceased until he was in approximately ten feet of the track, at which time it was too late to do anything to prevent the collision.

Plaintiff offered testimony that the deceased's car was approaching the track at about 15 miles per hour and that the speed of the car was never checked until the collision. Defendant's engineer admits he saw the truck 30 feet from the track and he admits that he paid no more attention to it until it was in about ten feet of the track and speeded up to cross. One of plaintiff's witnesses testified that the black car met deceased's car about ten feet from the track, another testified it was about 20 feet from the track. Plaintiff's testimony shows that the train whistled 135 feet from the crossing and shows that the deceased's car was passing the black car at the time of the whistle. Therefore, the jury could have found that deceased's car was 10 feet from the track when the train was 135 feet back. They could have found it was 20 feet from the track when the train was 135 feet back. They could have found from plaintiff's testimony that the truck was traveling 22 feet per second or 15 miles per hour; that deceased's train was traveling 50 miles per hour or 73-1/3 feet per second. The jury could have found that if the train was 135 feet from the crossing at the time of the whistle, it was 1.84 seconds from the crossing and if deceased was 20 feet from the crossing at that time he was less than a second from the crossing and, under the expert testimony offered by plaintiff, that if the train was in service application and the emergency brakes were applied 100 feet back from the crossing the train would have reached the crossing two seconds later and the accident would have been avoided.

We held that there was substantial evidence that by the exercise of ordinary care the engineer could have discovered the deceased's car in imminent peril in time to have applied his brakes and avoided the accident.

We cannot agree with the contention of defendant that the trial court, under the evidence, should have sustained its motion for a directed verdict.

Defendant contends under point II that the trial court erred in admitting incompetent, inadmissible and immaterial testimony offered by plaintiff's witness, Smallenberger, that the defendant's engineer could have slackened the speed of the train and avoided the collision

by putting on emergency and other applications of brakes of the engine, at points various distances from the crossing, where, at such points under the law and evidence in this case, there was no duty on the part of the engineer to do so and such evidence had no bearing on the case.

This case was tried on both primary and humanitarian negligence. The primary negligence was abandoned at the end of the trial and the cause submitted on humanitarian negligence.

Under humanitarian negligence the defendant owed the deceased no duty until, by the exercise of ordinary care, it discovered or should have discovered deceased in imminent peril and in danger of being struck by the train or that there was a reasonable chance that the deceased would drive into the pathway of the train and was oblivious to his position. It is true that any evidence offered that placed a duty upon the defendant to act before it was required to after the discovery of the peril of the deceased would be inadmissible. All of the evidence relative to whistling up at the sign boards a quarter of mile north of the crossing and relative to slowing the speed of the train to 35 miles per hour under conditions which applied far beyond where there was any duty imposed upon the defendant was not admissible under the issue of humanitarian negligence but was offered under primary negligence. This always puts the defendant in a dangerous position of having the jury's minds filled with evidence on primary negligence and then submit it only on humanitarian negligence, but we are in no position to remedy that situation. We cannot agree that there was reversible error in this case under this point.

Defendant's third objection is that the trial court erred in giving Instruction No. I. It contends this instruction goes beyond the law and evidence in submitting the question of imminent peril and when a person may be oblivious thereof, and placed the burden upon the defendant to warn deceased and slacken the speed of the train contrary to law and the evidence therein.

Instruction No. I reads as follows:

"The Court instructs the jury that if you find and believe from the greater weight of the evidence that on August 26, 1949, near Aurora in Lawrence County, Missouri, Rollie Everett Davidson, while driving an automobile east across a public crossing over defendant's railroad track, was struck and killed by a passenger train then being run and operated by the employees of the defendant, that deceased left no wife or minor children, either natural born or adopted, surviving him and left as his nearest relative his widowed mother, Mrs. Minnie Davidson; and if you further find that as deceased approached and went up upon said railroad crossing ahead of said approaching train he was then in a position of imminent peril and danger and was oblivious thereto and that M. F. McNabb, as an em-

ployee of the defendant, was then in charge of and operating the locomotive of said train and saw and knew, or in the exercise of ordinary care could have seen and known, that the deceased was in such position of imminent peril and danger, if so, and that he was oblivious thereto, if so, in time to have thereafter, by the exercise of ordinary care and with the means at hand and with reasonable safety to the equipment of said train and the persons thereon, sounded a warning of the train's approach and slackened the speed of said train and thereby have avoided the death of the said Rollie Everett Davidson, but that he negligently failed to do so, then you are instructed that the defendant was guilty of negligence. If you further find, as a direct result of said negligence, if any, said collision occurred and the said Rollie Everett Davidson was killed, then your finding and verdict should be for the plaintiff, provided you further find that Florence Hillhouse is the duly appointed and acting administratrix of the estate of Rollie Everett Davidson, deceased; and this is true even though you may find and believe from the evidence that the said Rollie Everett Davidson was guilty of negligence in going upon the crossing.''

We cannot agree with this contention on the part of defendant. The question as to whether or not the deceased was in imminent peril and that there was a reasonable chance as to whether or not he would be injured by the approaching train if discovered by the defendant's engineer in time to have warned deceased or to have slackened the speed, was a question of fact for the jury and we think was properly presented in this instruction had there been substantial evidence to support the law so declared. However, plaintiff's evidence fails to make a case as to defendant's failure to warn. The instruction requires the jury to find both the warning and slackening of speed. We think the instruction goes beyond the evidence.

There was but one question under the evidence in this case that should have been submitted to the jury and that is, was there substantial evidence tending to prove that defendant's engineer could have seen the deceased in a position of imminent peril in sufficient time thereafter, by the exercise of ordinary care, to have slackened the speed of the train sufficiently to have avoided the collision? Harmon v. Thompson (Mo. App.) 226 S. W. 2d 102, 104; Yeaman v. Storms, 358 Mo. 774, 217 S. W. 2d 495, 498.

Defendant cites Kirkpatrick v. Wabash R. Co., supra, 1. c. 768. This case follows the law as given in all of the other cases. The question of whether or not the engineer, by the use of ordinary care, could have determined that the deceased was in imminent peril under the humanitarian doctrine must be determined from the facts in the particular case, the demeanor and actions of the deceased as he approached the track, the position of the engineer to observe, and he

is required to act upon reasonable appearances and it is the province of the jury under the evidence to determine that question. If there is substantial evidence to support their finding their verdict must stand. We might differ from the jury as to the conclusion reached but it is not the province of this court to pass upon the facts. We are bound by the findings of the jury if there is any substantial evidence to support their finding. We agree with defendant's contention and it is supported by the case just cited that "position of peril" or "imminent peril" as applied to the humanitarian doctrine does not mean a bare possibility of danger. It means a certain peril, a place where danger is imminently impending.

Defendant's assignments of error under points IV and V are not discussed by it and, therefore, we shall not pass upon these questions.

We think this case should be reversed and remanded and tried in accordance with this opinion. We think that the case is so questionable on the facts that it is necessary to give the jury the facts on the issues involved without the mass of testimony as introduced in this case under alleged grounds of primary negligence which might have affected their judgment.

Judgment reversed and remanded. *Vandeventer, P. J.,* concurs.

BLAIR, J.—The case of Tharp v. Thompson, 139 S. W. 2d 1116, involving the same railroad crossing and the same appellant, as in the above case, was tried by me as attorney for appellant before I became a member of this court. For that reason I decline to sit in this case.