JOSEPH T. AYRES, Respondent, v. EDGAR ALLEN KEY, Appellant, No. 41223—221 S. W. (2d) 719.

Division Two, June 13, 1949.

Rehearing Denied, July 11, 1949.

*Moser, Marsalek, Carpenter, Cleary & Carter, F. X. Cleary* and *William H. Allen* for appellant.

*J. C. Guise, Jr.,* and *Everett Hullverson* for respondent; *Douglas MacLeod* of counsel.

346

ELLISON, J.—This is a suit for damages for personal injuries sustained by the plaintiff-respondent, a pedestrian, when struck by the automobile of the defendant-appellant at the southwest corner of the intersection of Grand Avenue and Lindell Boulevard in St. Louis on March 7, 1947, about 11 o'clock a. m. The plaintiff recovered a jury verdict for $10,000. The defendant appeals contending the evidence showed the plaintiff walked against and collided with the automobile instead of it striking him; and that he·made no case for the jury in any view, or at least not on all the three theories submitted by his principal instruction in the disjunctive; and that the damages awarded were excessive.

The plaintiff's petition contained six allegations of primary negligence, and one of negligence under the humanitarian doctrine. But he abandoned the allegations of primary negligence, and submitted his case to the jury solely on the humanitarian theory of defendant's failure to exercise the highest degree of care in three alternative particulars, namely: by stopping, or swerving, or sounding a warning, after seeing or being dutybound to see the plaintiff in a position of peril. A great number of decisions have been cited by counsel on both sides, but it seems to us the main underlying issue must turn on questions of fact.

The plaintiff was the only witness in his own behalf except three medical witnesses who testified on the nature, extent and duration of his injuries. Grand Avenue runs north and south and Lindell Boulevard east and west, intersecting at right angles. Plaintiff testified

he was on the sidewalk at the southwest corner of the intersection waiting to cross Lindell to the Melbourne Hotel at the northwest corner. Five or six other pedestrians also were there. At the outset the signal lights favored traffic moving east and west on Lindell. The group were waiting for the lights to change and release north and south traffic on Grand Avenue. From his position plaintiff could have looked 90 degrees east over his right shoulder and seen the Lindell traffic light at the southeast corner of the intersection change to red. Or he could have looked to the northeast corner of the intersection and seen the Grand traffic light change to green. From the testimony of a witness for defendant, it appears that in the process of changing from green to red or vice versa, the lights would show an intermediate amber color.

Plaintiff testified he did not see the signal lights change. But he did see the Grand Avenue traffic start to move south, and the others in his group of pedestrians advanced north onto the Lindell Boulevard pavement some three to six feet out from the south sidewalk. He went along with them and was furthest east, about where the white lines for the north and south cross-walk were marked on the pavement. One of the photographs in evidence, Plaintiff's Exhibit 23, is set out at the end of this opinion. It looks west on Lindell Boulevard from east of Grand Avenue. It shows automobiles parked westerly along both the north and south curb lines of Lindell Boulevard for a considerable distance, beginning a car length or two (estimated) west of the line of Grand Avenue and a fire hydrant at that corner. A witness for defendant testified there were two traffic lanes on each side of the center line on Lindell in addition to the parking space on the two sides.

Apparently the group of pedestrians had stepped out into the open space on the south side of Lindell east of the parked automobiles. This group of pedestrians may have "jumped the gun" a little in moving out into the street, or have started as soon as the traffic light on Grand Avenue changed from red to amber. At any rate the eastbound line of motor traffic on Lindell was still traveling east when the pedestrian group moved out abreast from the south side of the street to a position three to six feet north of the south curb. The motor traffic was still further out moving parallel to and south of the center line of the street. Defendant's automobile was the last in the line or nearly so. Plaintiff testified that he could see it advancing 40 to 50 feet away at a speed which he estimated to be 25 or 30 miles per hour. The automobile continued at undiminished speed without sounding a warning, and when up near the west line of Grand Avenue suddenly made a turn to the right into Grand Avenue, cutting the corner and sideswiping and striking plaintiff with the right front fender and breaking his leg.

On cross-examination plaintiff stated he stood in the street .(Lindell) three to six feet north of the south sidewalk. Being asked about a deposition he had given, where he said he had started to take "one or two steps", he answered "I made one step when he made a turn and hit me unexpectedly." Continuing, he said the automobile was pretty close when he took his first step—it must have been because it hit him when it made a quick turn. Later he said the automobile was traveling out in the middle of the street, and for that reason the pedestrians had room to take a step or two out from the curb. And after that he estimated the distance between the moving automobile line and the standing pedestrians at five or six feet.

The defendant testified he reached the rear of the standing line of motor cars on Lindell just about the time the traffic light turned green and permitted them to go forward across Grand. He saw the group of pedestrians standing in the cross-walk at the southwest corner of the intersection. When he reached that point he was hardly moving and the same was true of the cars ahead of him. He said he was not traveling over 2-4 miles per hour, and when he began to make a right turn into Grand Avenue he heard a brushing sound on the right side of his automobile and saw the plaintiff's face through the right rear window. The defendant declared he stopped within a foot. On cross-examination he said his automobile was about half way in its southeast turn when he stopped, and was headed southeast 10 or 12 feet east of the cross-walk, but still within the south boundary line of the intersection. After the collision the plaintiff was lying on the pavement 2 or 3 feet east of the north and south cross-walk line and about 12 feet north of the south line of the intersection.

Defendant's witness Jennings testified that plaintiff stepped off the curb at the intersection and walked out two or three steps into the right rear fender of defendant's automobile, as the latter was swerving to the right onto Grand Avenue. He didn't remember that five or six other pedestrians also were out in the street, and thought defendant's automobile was travelling at the usual speed for a motorist with the traffic light in his favor. Another witness for defendant (Miss Hayden) said she and a group of pedestrians at the intersection had stepped off the curb onto the pavement one or two steps ahead of the traffic light change on Grand Avenue. She didn't see defendant's automobile until just before the casualty when "the man walked into the side of the car or was hit by the car." But she said it was travelling at ordinary speed, and apparently conceded it swerved to the right, though she was equivocal as to that.

 On these facts the defendant-appellant makes the following legal contentions and cites authority therefor. First, he maintains that since plaintiff submitted his three charges of humanitarian negligence (failure to stop or to swerve or to warn) in the disjunctive.

it was incumbent on him to make a substantial prima facie showing on *all* three charges. The authorities he cites so hold. Setser v. St. L. Pub. Serv. Co. (St. L. Ct. Apps.) 209 SW. (2d) 746, 752(10); Carlisle v. Tilghmon (Mo. Div. 2) 159 SW. (2d) 663, 665(4); Martin v. Springfield Water Co. (Mo. App.) 128 SW. (2d) 674, 682(9); Monsour v. Excelsior Tobacco Co. (Mo. App.) 115 SW. (2d) 219, 224(14); Whitehead. v. Fogelman (Mo. Div. 2) 44 SW. (2d) 261, 263(5).

Secondly defendant contends plaintiff failed to make a substantial showing on *any* of those three charges. Passing for a moment the question whether plaintiff made a submissible case on failure to *stop*, we think he did make a case for the jury on failure to swerve and warn, even assuming the defendant's automobile was moving at a speed of about 25 to 30 miles per hour as plaintiff estimates (and defendant denies). He saw the group of pedestrians there and nevertheless turned in their direction. The physical facts he narrates show that. He could have sounded his horn and attracted attention to his approach, and he could have swerved to the left if a collision seemed imminent.

The plaintiff could have been, and on his testimony was, in a position of peril without knowing it. He testified the defendant was driving his automobile eastwardly on the right side of and close to the mid-line of Lindell Boulevard at a speed of about 25 miles per hour, and appeared to be intending to continue on east across Grand Avenue. Hence plaintiff had no apprehension of being struck. But the defendant had the fixed intention of turning to the right and suddenly did so, thereby exposing plaintiff to imminent peril from which he could not escape.

Returning to the question whether the plaintiff made a submissible showing that the defendant could have *stopped* his automobile before the collision. Defendant invokes Elkin v. St. L. Pub. Service Co., 335 Mo. 951, 958(4), 74 SW. (2d) 600, 603-4(8), where the plaintiff tried his case on the theory that the speed of a streetcar was 25 or 30 miles per hour. But he failed to offer any evidence as to the distance in which the streetcar could have been stopped, going at that speed. The decision held he failed to make a prima facie case that the casualty could have been averted by stopping the streetcar. On the other hand, plaintiff relies on State ex rel. Thompson v. Shain, 351 Mo. 530, 546-8(1), 173 SW. (2d) 406, 407(2). That decision held that where a plaintiff had testified the speed of a train was *about* 25 to 30 miles per hour, it was a mere guess or estimate and he was not conclusively bound by it as bearing on the issue whether the train could have been stopped in time to prevent the collision.

We think the instant case comes within the latter decision. The plaintiff here on direct examination testified the defendant's automobile "was going *about* 25 miles per hour." Later he said it "was

going *about* 25 or 30 miles an hour" when he first saw it. On cross-examination he testified the automobile "was at all times going 25 or 30 miles per hour," and that he "would judge" it was going at that speed. Defendant-appellant's theory is that the foregoing testimony absolutely committed the plaintiff to the theory that defendant's automobile was travelling at 25 to 30 miles per hour, and that at that speed it could not be brought to a stop within 40 to 50 feet, or at least that plaintiff offered no testimony to that effect. But defendant is in error on that point.

On cross-examination defendant was asked whether he could stop his automobile going 25 or 30 miles per hour in 10 or 15 feet with good brakes, and he answered "I don't know; I never checked on that." Then he was asked whether his automobile had good four-wheel brakes, and he said it did. He was then asked if the automobile was about 15 feet long and he said he thought it was. Then he was asked "Couldn't you stop in a machine length going 20 or 30 miles an hour, under the circumstances present there?" And he answered ▮▮▮ "I think you can." He further stated that in making that kind of a stop the wheels would put a skid mark on the pavement.

Defendant-appellant also contends that the $10,000 verdict of the jury was excessive. The plaintiff suffered fracture of the neck of the right femur and developed pneumonia. Surgery was necessary to repair the fracture but it had to be postponed for two weeks until after the plaintiff had recovered from the pneumonia. The fracture was repaired by cutting into the region of the hip joint and fastening together the two parts of the femur with pins and a Peterson nail. Plaintiff was confined to the City Hospital for five weeks and was away from his employment for about 2-½ months during which time he earned no money. His salary as a clerk in the city assessor's office had been $225 per month. He was required to use crutches for 1-½ months. His hospital bill was $300. He testified in June, 1948, fifteen months after his injury, that the fractured leg and his back hurt him all the time, and kept him awake almost all night. He already had high blood pressure and the injury raised it. X-ray pictures showed periostitis and arthritis which usually produce pain. At the time of trial he still needed medical advice and took heat treatments by electric pads and hot baths. Plaintiff was 64 years old and married. Under this evidence we think no remittitur is called for, in the light of such cases as Webb v. M.-K.-T. Rd. Co., 342 Mo. 394, 399(3), 116 SW. (2d) 27, 30(8); Byars v. St. L. Public Service Co., 334 Mo. 278, 296(5), 66 SW. (2d) 894, 903(12); Bowman v. Standard Oil Co. of Indiana, 350 Mo. 958, 967(5), 169 SW. (2d) 384, 388(11).

The judgment is affirmed. All concur..