JOHN DISTER, Respondent, v. EILEEN WALDMAN LUDWIG, a minor, by HAROLD LUDWIG, guardian ad litem, Appellant, No. 41899—240 S. W. (2d) 694.

Court en Banc, June 11, 1951.

*Walther, Hecker, Walther & Barnard* and *Harold F. Hecker* for appellant.

*William L. Clinton* and *Carleton & Clinton* for respondent; *Orville Richardson* of counsel.

HOLLINGSWORTH, J.—In this action plaintiff alleged that as he walked southward into the north portion of Chouteau Avenue in the City of St. Louis to board a westbound streetcar standing on the east side of its intersection with Theresa Street he was negligently struck and injured by an automobile driven west-

ward by defendant. He recovered judgment for $8,100, and defendant appealed.

The cause was submitted under the humanitarian doctrine. Defendant assigns as error: (1) that no submissible case was made, (2) admission of prejudicially incompetent evidence, and (3) certain instructions given in behalf of plaintiff.

Chouteau Avenue extends east and west; Theresa north and south. Theresa intersects Chouteau on the north at a right angle, veers slightly to the east, and then leaves it on the south at a right angle. Two streetcar lines extend along the center of Chouteau, the south line being used for eastbound cars and the north line for westbound cars. It is 18 feet from the north curbline of Chouteau to the north rail of the north tracks. A safety zone, 5 feet and 6 inches in width, for alighting and departing passengers on westbound streetcars, extends 61 feet eastward on Chouteau from the intersection of Theresa. It is adjacent to the north rail of the westbound tracks. However, the north line of the safety zone is several feet shorter than its south line at the east end. To mark its eastern boundaries four metal buttons are diagonally set from the east end of its north line to the east end of its south line. The distance between the north curbline of Chouteau and the north line of the safety zone is 12½ feet. Defendant's automobile, a red Oldsmobile, is 6 feet wide.

On the date plaintiff was injured, May 27, 1948, he was a bookkeeper, accountant and cashier for Viteena Feed Mills, which is located on the north side of Chouteau, 200 feet west of its intersection with Theresa. At 6:45 P. M., he left his office for the purpose of boarding a westbound streetcar at the intersection of Chouteau and Theresa to go to his home. There is a light pole at the northeast corner of the intersection. The west end of the safety zone is directly south of this light pole. As plaintiff proceeded westward to the corner he saw the streetcar coming westward. When he came to within two or three feet of the light pole, he saw the streetcar stopped with its front end at the west end of the safety zone. Its front doors were open for receiving passengers. At the same time he saw defendant's automobile at the east end of the safety zone, proceeding westward with its left side adjacent to the north line of the safety zone. He observed its speed and estimated it to be then travelling at 15 to 20 miles per hour. Plaintiff then testified: "Well, I dashed across, I started across the street about two or three feet from the lamp post, east of the lamp post, at a slight angle to get the streetcar, and as I got to the safety zone line, I was struck by this automobile"; and that the car brushed his left side causing him to fall, breaking his ankle. There was further evidence in behalf of plaintiff that defendant's automobile did not stop, swerve or sound any warning from the time he first saw it until it struck him. The automobile came to a stop at the point plaintiff fell.

On direct examination, plaintiff further testified:

"Q. Now, when you first saw this automobile, Mr. Dister, where was it in relation to the side of the safety zone?

A. When I first saw it it was at the rear end of the streetcar.

Q. It was right at the rear end of the streetcar, but where was it in relation to the safety zone, the side of the safety zone?

A. Right around the line of the safety zone."

\* \* \* \*

"Q. Now, did you watch this automobile as you proceeded across the street toward the streetcar?

A. I looked once, saw it, and I proceeded to cross to the streetcar.

Q. You didn't see it any more then until you were struck?

A. Until after I was struck, that is right.

Q. Did you see the automobile after you were struck?

A. After I was down, yes, on the street.

Q. Where was it in relation to the safety zone at that time?

A. I was in the safety zone. It was right next to my head. As I turned my head the left front wheel was right next to my head, right there at the line."

\* \* \* \*

On cross examination, plaintiff further testified:

"Q. So that the front end of that car [meaning defendant's automobile when plaintiff first saw it], at least, and the side was past the buttons at the back end of the safety zone, you are sure of that? A. Yes.

Q. And was near the rear end of the streetcar?

A. That is correct.

Q. *Did it seem to be coming right on through?*

A. *Sure, it was doing about 15 or 20 miles an hour.*

Q. Now, you say as you saw it there before you started out on the street, it was coming at the back end of that streetcar somewhere along this safety zone here doing 15 or 20 miles an hour. Did it give any indication of slowing down?

A. Just a little.

Q. Did it give a horn? A. No.

Q. *Looked to you as if it was going right on through past, did it?*

A. *Going on past the safety zone.*

Q. *As though it was coming right on past it. Yet you want the jury to understand you walked right out from the curb to get over to the safety zone, when that car seemed to be coming straight through without stopping; is that what you want the jury to understand?*

A. *Well, there was a number of feet there between the—*

*Q. Just answer me, is that what you want the jury to understand, that you walked right out from the curb towards the front door of that car when you saw the car coming through the safety zone going about 15 miles an hour; is that what you want the jury to understand?*

*A. That is right."*

* * * *

"Q. When you came out from the curb, didn't you run out from the curb to get on that streetcar?

A. No."

* * * *

"Q. You didn't run at all, just walked the ordinary gait?
A. Maybe a little faster gait."

* * * *

"Q. Was there any thing to prevent you from looking again toward the east as you went from this curbline out here to the safety zone, anything that interfered with your seeing that automobile coming? A. No.

Q. The last time you saw it just when you started off, you say it was coming about 15 miles an hour, is that right?

A. I figured it was going to stop."

* * * *

Plaintiff introduced in evidence Section 2472 of the Revised Code of the City of St. Louis, an ordinance reading as follows:

"Stopping Behind and Passing Streetcars—The operator of a vehicle overtaking any streetcar stopped or about to stop for the purpose of receiving or discharging any passengers shall stop such vehicle to the rear of the nearest running board or door of such streetcar, and keep it stationary until any such passenger has boarded such car or reached a place of safety except that where a safety zone has been established, the vehicle need not be stopped before passing any such streetcar, but may proceed past such streetcar at a speed not greater than is reasonable and proper, and with due caution for the safety of pedestrians."

Briefly stated, defendant's version, supported by her testimony and that of several guest passengers riding with her and other witnesses, was that as she drove west a streetcar overtook her and stopped at the streetcar stopping place. She saw plaintiff running westward on the sidewalk on the north side of Chouteau as though to catch the streetcar. She stopped near a trolley pole (31 feet east of the light pole). The man stopped, she believed, near the trolley pole. The streetcar began to move slowly away, she started her car, the man dashed across the street in a vain attempt to get the streetcar and he fell as he passed her automobile. Her automobile

did not touch him at all. When plaintiff started to fall he was two or three feet in front of her automobile, almost to the safety zone, and he fell into the safety zone. She was travelling only 3 or 4 miles an hour when plaintiff fell, and stopped her automobile almost immediately. She was taken to the police station and released from custody after the police talked with plaintiff over the telephone and he told them he did not want her prosecuted.

Thus it is seen defendant's version of the happening is so completely at war with plaintiff's evidence, that no part of it may be seized upon by plaintiff to piece out his case except such parts thereof as may tend to support his version of the facts. Pentecost v. St. Louis Merchants' Bridge Term. R. Co., 334 Mo. 572, 66 S. W. 2d 533, 535-536; Steuernagel v. St. Louis Public Service Co., 357 Mo. 904, 211 S. W. 2d 696, 697.

Upon the evidence above narrated, the trial court submitted the issue of defendant's negligence under the humanitarian doctrine on four specifications of negligence after plaintiff came into a discoverable position of imminent peril, to-wit: failure, by the exercise of the highest degree of care with the means at hand, and with safety to herself, the automobile and its occupants, to have either stopped her automobile or sufficiently slackened its speed, or swerved her automobile, in time to have avoided striking plaintiff, or to have sounded a warning of her approach. Inasmuch as all four of these specifications of negligence were submitted in the disjunctive, there must be evidence to support the submission of each of them; otherwise the trial court was in error in submitting such as were not supported by the evidence. Carlisle v. Tilghmon, Mo. Sup., 159 S. W. 2d 663, 665; Ayres v. Key, 359 Mo. 341, 221 S. W. 2d 719. Therefore, did the evidence warrant the submission of all four? The answer to this question requires an analysis of the evidence most favorable to plaintiff.

When plaintiff was at the curb and three feet east of the lamp post he looked to the east and saw defendant's car coming westward near the north line of the safety zone, with its front end past the buttons marking the eastern limits of the zone. We may, therefore, assume that the front end of defendant's automobile at that moment was at least five feet west of the east end of the 61 feet in length zone, or 56 feet from its west end. Plaintiff was aware of defendant's approach, her distance from his path of travel and the rate of speed at which she was proceeding; he so testified. Plaintiff, then walking at "maybe a little faster gait" than an ordinary walk, stepped from a position of safety on the curb into the street.

According to plaintiff's testimony, defendant was travelling at 15 to 20 miles per hour, which she slowed to 15 miles per hour. We will henceforth accept that rate of speed as correct. There was no evidence, other than defendant's, to the contrary. There was

no evidence as to the distance in which an automobile going 15 miles per hour can be stopped with safety, but we have taken judicial notice of the distance in which an automobile travelling at 15 miles per hour can be stopped. See cases cited and analyzed in Hutchison v. Thompson, Mo. Sup., 175 S. W. 2d 903, 909. We have also judicially noticed that reaction time is required for a motorist to apply brakes on an automobile. Yeaman v. Storms, 358 Mo. 774, 217 S. W. 2d 495, 498, and cases therein cited.

There was no evidence as to the rate at which plaintiff was travelling as he walked "maybe a little faster gait" than an ordinary walk as he left the curb to board the streetcar. We have judicially noticed, however, that "the ordinary walking speed of the average man is two to three miles per hour, more nearly the latter." McGowan v. Wells, 324 Mo. 652, 24 S. W. 2d 633, 639. Hence, we may reasonably assume that an average man walking "a little faster gait" than an ordinary walking gait would travel approximately 3½ miles per hour.

At this point it is necessary to determine when plaintiff may have come into a position of imminent peril. Under the ordinance introduced in evidence ▇▇▇ defendant was required to proceed past the streetcar at a speed not greater than was reasonable and proper with due caution for the safety of pedestrians, yet, if plaintiff saw defendant's automobile, saw its distance from him, saw and appreciated its speed and saw that she intended to drive on past the safety zone, then the ordinance would avail him nothing. He could not assume defendant would obey the ordinance if his senses told him otherwise. Under the humanitarian doctrine defendant owed no duty to plaintiff until he came into a position of imminent peril. Yeaman v. Storms, supra. "The meaning of the term 'imminent peril' as the basic fact of the humanitarian doctrine has been well settled. The peril truly must be imminent—that is, certain, immediate, and impending; it may not be remote, uncertain or contingent. A likelihood or bare possibility of injury is not sufficient to create imminent peril." Blaser v. Coleman, 358 Mo. 157, 213 S. W. 2d 420.

The zone of imminent peril may be increased or diminished, depending upon whether plaintiff was aware or oblivious to the likelihood of being struck by defendant's automobile when he crossed from the curbline of Theresa to board the stopped streetcar. "Certainly when a person knowing of the near approach of an oncoming vehicle deliberately (with ability to stop) goes into its path, either defiantly or in an attempt to take the right of way or 'to beat it across' or otherwise acting to place all responsibility for avoiding contact upon the operator of such vehicle, the zone of his peril is very narrow and the duty of such operator to act does not commence until such person is actually in its path or so close to it that it is apparent (at the rate of

speed and the manner he is moving) that he will not stop before reaching it. * * * This is because a person, who is not oblivious and has the ability to stop, is not in a position of any peril whatever (certainly not imminent peril) when he is merely moving toward the path of a moving vehicle, and he does not come into a position of imminent peril therefrom until he is directly in the path of such vehicle or so close thereto that he cannot stop short of its path.'' Smithers v. Barker, 341 Mo. 1017, 111 S. W. 2d 47, 53. See also Pentecost v. St. Louis Merchants' Bridge Term. R. Co., supra; Kirkpatrick v. Wabash R. Co., 357 Mo. 1246, 212 S. W. 2d 764, 768, and Redden v. Boehmer, Mo. App., 223 S. W. 2d 127, 130.

Plaintiff testified positively that before he stepped from the curbline he saw defendant's automobile coming at the back end of the streetcar at a rate of speed of 15 to 20 miles per hour and that it looked to him as if it was *"going on past the safety zone."* He then reiterated that he walked out from the curb toward the front door of the streetcar *when he saw the car coming through the safety zone going about fifteen miles an hour.* It is true that later, under further cross examination, plaintiff volunteered a statement that ''I figured it was going to stop'', but plaintiff's solemn admissions theretofore twice made that defendant's automobile appeared to be going on through the safety zone (with no effort thereafter made by plaintiff or his counsel to show that these admissions were mistakenly or inadvertently made) cannot be negatived by his voluntary statement thereafter made. We, therefore, conclude that as plaintiff left the curb and proceeded across the street he was not only aware that defendant's automobile was likely to continue on, but he was also aware of its distance from him and saw and appreciated its rate of speed. Under these circumstances, he must be charged with consciousness of the fact that if he continued to walk toward the streetcar he would be imperiled; and, so knowing, he could stop within one or two steps. He was not, therefore, in a position of imminent peril until he was within a step or so before going into the path of defendant's automobile. McGowan v. Wells, 324 Mo. 652, 24 S. W. 2d 633, 638, and cases therein cited; Lamoreux v. St. Louis-San Francisco Ry. Co., 337 Mo. 1028, 87 S. W. 2d 640; Smithers v. Barker; Redden v. Boehmer; Yeaman v. Storms, all supra; Robards v. Kansas City Public Service Co., 238 Mo. App. 165, 177 S. W. 2d 709, 711.

Plaintiff cites the following cases: Bootee v. Kansas City Public Service Co., 353 Mo. 716, 183 S. W. 2d 892; Schmitt v. American Press, Mo. App., 42 S. W. 2d 969; Hoelker v. American Press, 317 Mo. 64, 296 S. W. 1008; Pitcher v. Schoch, 345 Mo. 1184, 139 S. W. 2d 463, and Linders v. Peoples Motorbus Co., 326 Mo. 695, 32 S. W. 2d 580. In each of these cases, however, the plaintiff, although aware of the approach or location of the vehicle which later struck him,

was, under the peculiar circumstances of each case, oblivious of his peril. That is not the situation in this case.

When plaintiff left the curb from a point three feet east of the lamp post he was approximately seven feet from the path of defendant's automobile. He was then walking, as we have estimated, at a rate of 3½ miles per hour, or 5.1 feet per second. A jury could reasonably find that his first step from the curb placed him in a position of peril. He would then be within 5 or 6 feet, or two steps, from the path of the automobile. Defendant was then travelling at a rate of speed of 15 miles per hour, or 22 feet per second. Assuming it took one second for her to realize plaintiff's peril and react to it, she would yet be approximately 34 feet east of plaintiff. A jury could reasonably find that she could have stopped her automobile within less distance and thereby avoided striking plaintiff as he walked through her path of travel. Hence, plaintiff made a submissible case on defendant's failure to stop.

When we next consider that plaintiff came so near to getting by her car that the left fender merely brushed his left side, it is readily apparent also that had she slackened its speed, as obviously she could have done, plaintiff would have been enabled to pass in front of her automobile without collision therewith.

As to swerving and thereby avoiding plaintiff, it must be borne in mind that defendant could not swerve to her left into the safety zone without endangering herself and others. Neither could she swerve to the right without inevitably running plaintiff down until he had reached a point (which of necessity would be somewhere in the present path of her automobile) that she could swerve to the right without coming into collision with him. If we assume that point at the center of defendant's path of travel, plaintiff would have travelled between 8 and 9 feet from the beginning point of his position of imminent peril in less than two seconds' time. In the meantime, defendant would have travelled in the same time from the point of 56 feet east of plaintiff's line of travel less than 44 feet. There would then have remained a distance of 12 or more feet for her to swerve three feet or less to avoid striking plaintiff. We believe a jury might reasonably find she could have done so. ·

We next consider whether, under the evidence, plaintiff was entitled to submission of the case upon the failure of defendant to sound a warning of her approach. As stated, plaintiff's testimony shows he was not oblivious to his peril. "Obliviousness is certainly a necessary element to making a humanitarian negligence case of failure to warn. * * * The humanitarian doctrine seizes upon the situation as it exists without regard to antecedent acts of either party. A warning could serve no purpose after plaintiff became aware of the approach of the train." Pentecost v. St. Louis Merchants' Bridge Term. R. Co., 334 Mo. 572, 66 S. W. 2d 533, 535. See also Kirkpatrick

v. Wabash R. Co., 357 Mo. 1246, 212 S. W. 2d 764. It is clear the trial court erred in submitting the case upon failure to warn.

 Over objection of defendant, plaintiff and his daughter were permitted to testify that on the day after plaintiff was injured defendant came to plaintiff's home to see how he was getting along and said she was sorry the accident happened; gave him a box of candy; asked the amount of the hospital and doctor's bills; requested plaintiff to get all bills together and to let her know; told him she would see they were paid, and wrote her name, address and telephone number on a piece of paper which she gave to plaintiff. This paper was also introduced and admitted into evidence.

Prior to the admission of this testimony, counsel for plaintiff explained that it was being offered as a circumstance tending to show defendant's automobile did strike plaintiff and was not offered as an admission of negligence. The trial court announced that notwithstanding the ruling in Smith v. Fine, hereinafter referred to, he thought, in view of defendant's denial of striking plaintiff, the testimony was competent. At the same time the trial court proposed that defendant offer an instruction limiting the testimony to the issue of whether defendant's automobile struck plaintiff. Defendant did not accept the proposal.

In the above mentioned case of Smith v. Fine, 351 Mo. 1179, 175 S. W. 2d 761, 767, testimony quite similar to that above stated was held inadmissible as an implied admission of negligence or liability. To the same effect is the case of Winter v. Van Blarcom, 258 Mo. 418, 423, 167 S. W. 498, 499. Although there are cases to the contrary (Hanlon v. Lindberg, 319 Ill. App. 1, 48 N. E. 2d 735; Watt v. Associated Oil Co., 123 Ore. 50, 260 P. 1012, 1013, and others), this seems to be the rule generally. 31 C. J. S., § 291, p. 1050, l. c. 1052.

The reason for the rule is well stated in Quiel v. Wilson, Ohio, 34 N. E. 2d 590: "If such evidence were to be considered admissible, it is manifest that no one, however kindly disposed to be of service in an emergency, would dare proffer his service or agree to be responsible for care and treatment without jeopardizing himself and by such acts furnish evidence through which he would be held to account for an injury for which he was in no way legally responsible. The Good Samaritan would have furnished evidence thus against himself for the injuries to the wayfarer who fell among thieves and robbers."

Plaintiff contends the rule above announced is not applicable to the facts in this case. Plaintiff did not offer the evidence to show negligence or liability. He expressly limited the offer as a circumstance tending to show that defendant's automobile struck plaintiff. In all of the cases above cited the fact that defendant operated the vehicle by which plaintiff was injured was admitted. In this case that was denied.

174

The case of Arnold v. Owens, 78 Fed. 2d 495, is strongly relied upon by plaintiff as illustrative of the distinction he draws. In that case, plaintiff, a pedestrian upon a public highway in the nighttime, was struck by a truck, which proceeded on. Witnesses telephoned ahead a description of the truck. Defendant was arrested. He denied his truck struck plaintiff. After discussing other circumstantial evidence offered as to the identity of the truck, the court said: "The evidence of identity was sufficient without certain testimony given by the father-in-law to the effect that on the day following the accident the defendant came to his house and amongst other things said he would help to pay the hospital expenses of the plaintiff. This testimony, first admitted, was later stricken out * * * and this ruling has been assigned as error. * * * Although the cases are seemingly in conflict upon the point, there is weighty authority, which includes the courts of North Carolina, that a voluntary offer of assistance made upon an impulse of benevolence or sympathy may not be considered an admission of culpable causation. * * * If, however, the surrounding circumstances indicate, not merely an act of benevolence, but some admission of fault on the part of the defendant, the evidence may be admissible. * * * Unless it should appear on a new trial of the pending case that the defendant's offer of assistance was accompanied by circumstances tending to show an admission of liability or an admission that his truck was the one involved in the accident, the evidence should not be received. Even if it is admitted, the jury should be cautioned that the offer alone is not evidence of liability." So it is seen that even where defendant denied his truck struck plaintiff, the court nevertheless held that evidence of defendant's offer of assistance should not be admitted *unless accompanied by circumstances tending to show an admission his truck was the one involved in the accident.* Were there such circumstances in this case?

Defendant, who was only seventeen years of age when the accident occurred, testified she went to plaintiff's home on the day following the accident and took him a box of candy, and that she did so because the policeman told her, when she was released from the police station, "It would be nice if you went to see him, since he didn't hold you", and he thought a box of candy would be nice. She admitted she may have written her name on a slip of paper and gave it to plaintiff, but denied she told him it was an unfortunate accident or that there was any mention of hospital or doctor's bills.

Her testimony that she went to see plaintiff following his consent that she be released from police custody, because it would be a "nice thing" to do, although its credibility is for the jury, is illustrative of one of the many motives that can, and we know do, actuate persons to do benevolent acts. The fact that she offered to pay all of plaintiff's medical expenses is not admissible as an admission of fault. Smith v. Fine, and other cases, supra. Neither is it necessarily an admission

that her automobile struck plaintiff. It could have as well been a voluntary act of mere benevolence. It was not made in response to a demand for damages, nor during any discussion of the cause of plaintiff's injuries.

Apparently, defendant has at all times consistently denied that her automobile struck plaintiff. At least, there is no admission shown, unless it be inferred from her visit to and conversation with plaintiff. She not only submitted her case upon non-negligence, but also upon the issue of fact as to whether her automobile struck plaintiff. One of the instructions given in her behalf stated: "* * * if you find * * * that plaintiff was not struck by defendant's automobile, then * * * plaintiff cannot recover * * *." Plaintiff and a bystander testified the automobile struck him. The streetcar motorman testified it may have touched plaintiff on his right side. A police officer testified plaintiff stated he thought he was brushed by the automobile, but was not sure. Defendant and her two guest passengers, two bystanders, and a passenger on the streetcar testified defendant's automobile did not strike plaintiff. To determine under these circumstances that defendant's acts and conduct constituted an admission her automobile struck plaintiff would be most conjectural, just as much so as it would be to determine from plaintiff's consent that she be released from a criminal charge he thereby admitted her automobile did not strike him. Surely, the latter would not be admissible for that purpose.

When we consider the beneficent purpose of the rule and the circumstances above set forth, we are constrained to hold the evidence of defendant's visit to and conversation with plaintiff inadmissible.

It is unnecessary to consider the assignments of error as to certain instructions. Upon another trial they can be written to conform to the evidence and the views herein expressed.

The cause is reversed and remanded.

*Leedy, Dalton* and *Hyde, JJ.,* and *Vandeventer, Special Judge,* concur; *Conkling, J.,* concurs in result but dubitante as to whether a submissible case was made as to failure to stop, slacken speed or swerve; *Tipton, J.,* dissents for reason that plaintiff fails to make a case under the humanitarian doctrine.